RICHARD MACKINTOSH AND LYNN MACKINTOSH, APPELLANTS, v. CALIFORNIA FEDERAL SAVINGS & LOAN ASSOCIATION DBA CALIFORNIA FEDERAL SAVINGS, NEVADA DIVISION, AND PRESTON R. CLARK, RESPONDENTS/CROSS-APPELLANTS, v. JACK MATTHEWS & CO., PAT HANSEN, RICHARD MACKINTOSH AND LYNN MACKINTOSH, CROSS-RESPONDENTS.

No. 27199

March 27, 1997                                935 P.2d 1154

*Peter H. Cuttitta,* Reno, for Richard Mackintosh and Lynn Mackintosh.

*Clark & Dickey,* Reno; *Beckley, Singleton, Jemison & List, Chtd.,* and *Daniel F. Polsenberg,* Las Vegas, for California Federal Savings and Preston R. Clark.

*Jack Matthews,* In Proper Person, Las Vegas, for Jack Matthews & Co.

*Pat Hansen,* In Proper Person, Sparks, for Pat Hansen.

## OPINION

*Per Curiam:*

Appellants/Cross-Respondents Richard and Lynn Mackintosh (the Mackintoshes) bought a house from Respondent/Cross-Appellant California Federal Savings and Loan (Cal Fed), which owned the house by way of foreclosure. Cal Fed was aware that the basement of the house flooded severely during high water times, but because the sale was "as-is," Cal Fed did not disclose this material defect to the Mackintoshes. Richard Mackintosh was told of the defect after the sale by a worker hired by Cal Fed and confirmed the worker's information after talking to the prior owner of the house. The Mackintoshes filed a complaint seeking recision of the contract and/or damages.

Cal Fed and other defendants were awarded summary judgment by the district court on the ground that the Mackintoshes knew or should have known of the defect. However, in an earlier opinion, we reversed the grant of summary judgment, stating that because Cal Fed was both the seller and the lender, a special relationship might have been created between Cal Fed and the Mackintoshes, which imposed a duty on Cal Fed to disclose the existence of material defects to the Mackintoshes.

On remand, the district court concluded that a special relationship did exist between the parties and that Cal Fed had breached its duty to disclose. The district court ordered recision of the contract and ordered Cal Fed to return the Mackintoshes' down payment and mortgage payments, minus the fair rental value of the property. The district court refused to award attorney's fees, punitive, or other damages, including those for emotional distress, and the Mackintoshes have appealed those decisions. Cal Fed appeals the district court's conclusion that a special relationship existed and that the Mackintoshes timely filed their complaint for recision.

We conclude that the district court's judgment was proper, with the exception of its decision refusing to award attorney's fees to the Mackintoshes. Therefore, we affirm the district court's judgment with the exception of the attorney's fees issue, and we remand this case to the district court for a determination of the amount of attorney's fees owed to the Mackintoshes.

## FACTS

This case has previously been before this court in Mackintosh v. Jack Matthews & Co., 109 Nev. 628, 855 P.2d 549 (1993) (*Mackintosh I*), wherein this court reversed a grant of summary judgment in favor of Cal Fed and other defendants. While many of the facts pertaining to this matter are stated in *Mackintosh I*, we will restate the facts relevant to the issues presented in this appeal.

This case involves the sale of a house located at 5600 Old Highway 395 South in the Washoe Valley. Cal Fed owned the house by way of foreclosure and had placed the property on the market for sale through Pat Hansen, an agent at the real estate offices of Jack Matthews & Company.

The Mackintoshes visited the property on their own. Richard stated that the house was in generally poor condition and that it had filthy carpet, a bad smell, and cracked linoleum flooring. Additionally, Richard stated that he went into the basement but that the lights did not work. Richard stated that he could tell that there had been water in the basement at one time because he saw water stains on the walls, and he also saw a freshly repaired pipe in the basement and concluded that the broken pipe was the source of the water damage. Accordingly, Richard never asked his real estate agent or anyone at Cal Fed about the water damage prior to the sale.

Prior to the sale, Cal Fed had knowledge that the basement had a serious flooding problem. In October 1985, approximately one year prior to the sale to the Mackintoshes, Cal Fed had hired Charles McMillan, a real estate appraiser, to conduct an appraisal

of the property in question. McMillan's appraisal mentioned that the home did not have proper drainage to funnel water away from the house and that such drainage was needed. At the time he conducted the appraisal, McMillan saw standing water in the basement and indicated that a new sump pump was needed. McMillan's appraisal also stated that the basement would need to be filled in if the drainage problem could not be repaired. This appraisal was sent to Cal Fed. Additionally, Paul Stuart, a former owner of the house, stated that he had informed Preston Clark, Cal Fed's person in charge of foreclosed property in the area, and other Cal Fed employees that the basement had flooded severely while he was in possession of the house.

While the house was still listed for sale, Cal Fed hired Waynco, a local construction company, to perform various repairs on the property in question. Waynco sent Mark Kirk to perform the work. Kirk stated that he was told to repair the bathrooms and kitchen, fix some electrical problems, install carpet, pump water out of the basement, and clean and repaint the basement. Kirk was also told to install a new drainage system around the house and a new sump pump in the basement to prevent future flooding. Kirk stated that this work was largely cosmetic and was done to make the house more appealing to potential buyers.

Kirk stated that he began his work in the basement, which had about four feet of standing water in it. Kirk drained all of the water and washed out the basement. About a week after Kirk began working at the house, David Foote, the owner of Waynco, and Clark went to the house while water was still in the basement. Kirk told Foote that the basement flooding was due to a structural flaw in the design of the house and that the water was seeping in through the walls of the basement.

Foote and Clark later instructed Kirk not to paint the basement, not to install a drainage system, and not to discuss the job with anyone. Kirk was instructed to finish other cosmetic work, and was in the process of doing so, when Richard visited the house. Richard did not introduce himself as a prospective purchaser, and Kirk stated that he told Richard that he worked for Waynco and was detailing the house for sale.

Cal Fed had listed the house for sale "as-is." The Mackintoshes submitted an offer on the property for the full asking price of $122,400. Cal Fed submitted a counteroffer that required the Mackintoshes to seek and obtain a loan from Cal Fed for the purchase of the home. The Mackintoshes accepted the terms of the counteroffer, and escrow closed on the house on October 29, 1986.

At some point after the Mackintoshes accepted Cal Fed's

counteroffer but before the close of escrow, Richard went to see the house again. When he arrived, he saw that all of the carpet had been removed from the house and stacked in the driveway. Richard visited the house again two or three days before escrow closed, and he noticed that the house had been painted and that some of the toilets had been replaced. Richard stated that these repairs were not preconditions to the sale and that because Cal Fed was undertaking to repair the house, he felt that the ''as-is'' provision covered only the defects that he could see and that Cal Fed was repairing the latent defects.

At the close of escrow, Richard was shown a pest control report which indicated that there was excessive moisture in the house and the basement. Richard stated that he was unconcerned by the report because he believed that the excessive moisture had come from the broken pipe in the basement.

After the close of escrow, Waynco continued to perform work on the house for approximately two weeks. Richard assumed that Cal Fed was just trying to make the house livable. Richard was presented with a bill for $800 for some electrical work Waynco had performed in relation to the installation of a new water heater, and after he refused to pay the bill, Waynco ceased working on the house. Some time during this two week period, Kirk informed Richard that water leaked through the basement walls, that the first time he saw the basement it had four feet of water in it, that he had originally been told to build a drainage system to prevent the flooding but was later told not to take such preventative measures, and that Richard could expect major flooding in the basement in high water years.

Richard attempted to confirm Kirk's information by writing a letter to Clark on December 4, 1986. The letter addressed the removal of the carpet, problems associated with Waynco's painting of the house, problems associated with the sealing of a well, and Richard's concern regarding the basement flooding. On January 8, 1987, Clark responded to Richard's letter. Clark's letter stated that the carpet had been removed because it was severely soiled and he had assumed that the Mackintoshes intended to install new carpet. The letter also stated that the house was painted because of a lack of prompt communication between Waynco's owner and workers, the painting was not intended to be part of the sale to the Mackintoshes, and Cal Fed had paid for the work. The letter did not respond to the inquiry about the well or the basement even though Clark personally had seen several inches of standing water in the basement. Clark stated that he did not answer the inquiry regarding the basement flooding because he believed that the basement water had come from a broken pipe which had already been fixed.

The Mackintoshes made no further inquiry regarding the flooding and experienced no problems until October 1987, when a few inches of water entered the basement where their son was sleeping. Based on Clark's lack of response to his inquiry and the minor 1987 flooding, Richard attempted to locate the prior owner of the house to inquire about the severity of the flooding problem. Richard stated that locating the prior owner took considerable time and that he finally located the owner sometime during the spring of 1988. At that time, Richard talked to Stuart, the prior owner, and was able to verify that the flooding problem was very serious. Stuart stated in a deposition that while he owned the house he had informed Clark on numerous occasions about the severity of the basement flooding problem.

On October 26, 1989, the Mackintoshes filed a complaint for damages and/or recision. The complaint was not served on Cal Fed until January 31, 1990. Cal Fed filed its answer on February 20, 1990. Cal Fed and the other defendants in the district court action filed a motion for summary judgment on the ground that the Mackintoshes had known of the water damage prior to the sale and had accepted the property "as-is." Summary judgment was granted in favor of the defendants, and the case was appealed to this court.

In *Mackintosh I,* we stated that the grant of summary judgment normally would have been appropriate given the fact that the Mackintoshes knew or should have known of the water damage. However, we stated that a special relationship between the Mackintoshes and Cal Fed may have existed which would have imposed a duty on Cal Fed to disclose the basement defect, the breach of which would result in Cal Fed's liability for fraud. This court then adopted a new rule which stated that a duty to disclose defects may exist if one party placed confidence in the other because of that party's position and the other party knew of that confidence. Mackintosh v. Jack Matthews & Co., 109 Nev. 628, 635, 855 P.2d 549, 553 (1993) (*Mackintosh I*). We stated that because Cal Fed acted as both the seller and the lender, the jury would have to determine whether the Mackintoshes put more confidence in Cal Fed than they would have in an ordinary seller and whether Cal Fed knew of that extra confidence. *Id.* at 636, 855 P.2d at 554. We then reversed summary judgment to let a judge or jury determine whether a special relationship existed such that Cal Fed had a duty to inform the Mackintoshes of the basement defect.[1]

_____
[1]After the case was remanded, the district judge granted summary judgment in favor of Jack Matthews & Co. and Hansen because we had concluded that those parties had not made any material false representations regarding the house. The grant of summary judgment left Cal Fed and Clark as the only

At the conclusion of a bench trial, the district court stated that under the general rule, Cal Fed had no duty to disclose the defect because the sale was "as-is." However, the district court continued by stating that pursuant to *Mackintosh I,* a special relationship existed between the Mackintoshes and Cal Fed which imposed a duty on Cal Fed to disclose the defect and that Cal Fed had breached that duty. The district court stated that the special relationship existed because Cal Fed was the seller and lender, Cal Fed cleaned, repaired, and replaced items on the property in question both before and after the sale, and Richard had placed special confidence in Cal Fed based on those two factors.

The district court also stated that the damage that Richard saw while inspecting the house would not necessarily have put an ordinary person on inquiry notice and that while it did not condone the Mackintoshes' failure to investigate the house further, the failure to investigate did not outweigh Cal Fed's duty to disclose the defect.

The district court found that adequate grounds for recision existed and concluded that the Mackintoshes had exercised their right to recision in a timely fashion. Additionally, the district court stated that the Mackintoshes were entitled to recovery of their down payment and mortgage payments, minus the fair rental value of the house. However, the district judge concluded that the Mackintoshes were not entitled to recover "late charge" expenses, homeowner's insurance payments, or monies spent on improvements to the real property. The district court also did not award punitive damages or damages based on emotional distress. Finally, the district court stated that the Mackintoshes were not entitled to attorney's fees pursuant to the sales contract because the contract had been rescinded and was, therefore, null and void from its inception.

The Mackintoshes appeal that part of the district judge's decision concerning attorney's fees and consequential and punitive damages. Cal Fed's cross-appeal challenges the district court's holdings that a special relationship existed, the Mackintoshes timely filed their complaint, and the Mackintoshes did not waive their cause of action.

## DISCUSSION

*The district court properly applied this court's holding in Mackintosh I*

In its cross-appeal, Cal Fed argues that the district court improperly applied this court's decision in *Mackintosh I* and that

---

defendants in the district court action. In its order and decision, the district court dismissed Clark from the action, and Clark is named as a respondent here because the Mackintoshes challenged his dismissal.

no special relationship existed between the Mackintoshes and Cal Fed such that Cal Fed had a duty to disclose the defect in the basement. We conclude that the district court properly applied our holding from *Mackintosh I*.

In *Mackintosh I*, we stated:

> "Although a claim of nondisclosure will not overcome an 'as-is' clause, a claim of fraudulent concealment will. Nondisclosure will become the equivalent of fraudulent concealment when it becomes the duty of a person to speak in order that the party with whom he is dealing may be placed on an equal footing with him. The duty to speak does not necessarily depend on the existence of a fiduciary relationship. *Central States Stamping Co. v. Terminal Equipment Co.*, (C.A. 6, 1984), 727 F.2d 1405, 1409 [(6th Cir. 1984)]. '* * * It may arise in any situation where one party imposes confidence in the other because of that person's position, and the other party knows of this confidence. * * *' " *Id.* . . .

*Mackintosh I*, 109 Nev. at 634-35, 855 P.2d at 553 (quoting Mancini v. Gorick, 536 N.E.2d 8, 9-10 (Ohio Ct. App. 1987)) (citations omitted). We concluded by stating:

> A jury may find that a special relationship existed if the jury determines that California Federal's status as the lender as well as the seller would have caused a reasonable person to place more confidence and reliance on California Federal than would be placed on an ordinary seller. In other words, the jury must ascertain whether the Mackintoshes, under the circumstances, could reasonably expect California Federal, as lender and seller, to pay greater attention to its interests than would an ordinary seller who was not also providing long-term financing on the property.

*Mackintosh I*, 109 Nev. at 635, 855 P.2d at 554.

The trier of fact's verdict will not be overturned if it is supported by substantial evidence, unless the verdict was clearly erroneous when viewed in light of all the evidence presented. Bally's Employees' Credit Union v. Wallen, 105 Nev. 553, 555-56, 779 P.2d 956, 957 (1989). Substantial evidence is that which a reasonable mind might accept as adequate to support a conclusion. State Emp. Security v. Hilton Hotels, 102 Nev. 606, 608, 729 P.2d 497, 498 (1986).

Initially, we take this opportunity to further refine our holding in *Mackintosh I* by stating that the existence of the special

relationship is a factual question and that while a seller/lender situation creates an inference that the relationship was created, all of the facts must be considered in order to determine if the relationship was created. Using this refined test, we conclude that the district court's conclusion that Cal Fed and the Mackintoshes shared a special relationship was supported by substantial evidence.

First, Cal Fed rejected the Mackintoshes' initial offer and issued a counteroffer which specifically required the Mackintoshes to obtain financing for the house through Cal Fed. The record indicates that the requirement of financing only through Cal Fed was suspicious because it was not Cal Fed's policy to require buyers of Cal Fed's foreclosed homes to borrow money from Cal Fed. We concur with the district court's conclusion that a third party lender would likely not have lent money on the home unless and until the flooding problem was corrected and that it was a reasonable inference that Cal Fed required the Mackintoshes to seek a loan through it for that reason.

Second, Richard testified that he believed that because Cal Fed insisted that the Mackintoshes obtain a loan through them, Cal Fed knew of the condition of the house and would tell him if anything was wrong with the house despite its sale "as-is." Richard also stated that he believed that because Cal Fed was the seller and the lender it would not lend him the money if the property was not acceptable. Third, Cal Fed spent money to repair the property both before and after escrow closed. This evidence supported the district court's conclusion that the Mackintoshes had placed more confidence and reliance on Cal Fed than would be placed on an ordinary seller.

Additionally, evidence supported the conclusion that Cal Fed knew or should have known of the Mackintoshes' special reliance. Cal Fed apparently had no actual knowledge that the Mackintoshes had placed special reliance on it. Clark testified that he had no conversations with the Mackintoshes either before or after the sale, he first met the Mackintoshes at a deposition in 1990, and he received no communications that would lead him to believe that the Mackintoshes were placing any special reliance on either him or Cal Fed. However, Cal Fed did not need actual knowledge of the reliance to satisfy the second prong of the "special relationship" test. We stated that the first prong of the test required that the trier of fact find only that the conditions would cause a *reasonable person* to impart special confidence in the seller/lender. *Mackintosh I,* 109 Nev. at 635, 855 P.2d at 554. Therefore, we conclude that the second prong of the test also requires only that a reasonable lender would have known of this

confidence. Based on Cal Fed's actions with regard to the Mackintoshes, we conclude that sufficient evidence supported the district court's conclusion that a reasonable lender would have known of the special confidence.

*The district court did not abuse its discretion in finding that the Mackintoshes demanded recision in a timely manner and that their conduct was consistent with an intent to rescind*

Cal Fed argues that the Mackintoshes did not demand recision in a timely manner because they discovered the defect in November 1986 and did not file their complaint for recision until October 1989. We disagree.

### 1. *Timeliness*

The evidence proved that the Mackintoshes were first made aware of the flooding problem in or around November 1986, when Kirk told them of the problem. Then, in December 1986, Richard wrote a letter to Clark requesting information on the flooding problem, but received no response to his inquiry. In October 1987, several inches of water collected in the basement while the Mackintoshes' son was sleeping there; however, the district court stated that such a small amount of water was insufficient to put the Mackintoshes on notice of the severity of the flooding problem. After the October 1987 incident, Richard attempted to locate the prior owners of the house and eventually did so in the spring of 1988. At that time, Stuart confirmed that the basement was subject to severe flooding. In October 1989, approximately eighteen months after talking to Stuart, the Mackintoshes filed their complaint. The district judge concluded that the filing was timely and that the Mackintoshes had not waived their right to rescind.

"A party must rescind a contract within a reasonable time, but what constitutes a reasonable time depends upon the facts of a particular case and must be determined by the trier of fact." Wall v. Foster Petroleum Corp., 791 P.2d 1148, 1151 (Colo. Ct. App. 1989). Therefore, "delay alone does not necessarily constitute a waiver." McDonald v. Shore, 590 P.2d 218, 221 (Or. 1979).

We conclude that substantial evidence supported the district judge's conclusion that the Mackintoshes' complaint was timely filed. Kirk's statements, coupled with the minor 1987 flooding, were insufficient to place the Mackintoshes on notice of the severity of the flooding. Only when Stuart informed Richard in the spring of 1988 that the basement had seriously flooded while

Stuart was in possession of the house, was Richard put on notice of the severity of the flooding problem. Additionally, the Mackintoshes' complaint, filed in October 1989, approximately eighteen months after the conversation with Stuart, was properly deemed timely and not subject to dismissal on the ground of laches by the district judge. This court has stated:

> Laches is an equitable doctrine which may be invoked when delay by one party works to the disadvantage of the other, causing a change of circumstances which would make the grant of relief to the delaying party inequitable. Especially strong circumstances must exist, however, to sustain a defense of laches when the statute of limitations has not run.

Building & Constr. Trades v. Public Works, 108 Nev. 605, 610-11, 836 P.2d 633, 636-37 (1992) (citation omitted).

In the instant case, the statute of limitations on the Mackintoshes' action accrued in the spring of 1988, and the statute of limitations was either three years if the action was based on fraud or six years if the action was one based on a written contract. NRS 11.190(1)(b); NRS 11.190(3)(d). In either case, the statute of limitations had not expired when the Mackintoshes filed their complaint. Cal Fed argues that it was prejudiced by the delay because Stuart was dead by the time of trial; however, we conclude that no prejudice existed because Cal Fed participated in Stuart's deposition and had an opportunity at that time to inquire about Stuart's knowledge of the property.

### 2. *Conduct inconsistent with an intent to rescind*

Cal Fed also argues that the Mackintoshes exhibited conduct inconsistent with an intent to rescind. Specifically, Cal Fed argues that after the Mackintoshes discovered the flooding problem in the spring of 1988, they continued to make payments on the house and even made improvements to the property. The Mackintoshes argued that because they pled alternative and inconsistent remedies, i.e., damages and recision, their conduct of making payments and improvements is not evidence of conduct inconsistent with an intent to rescind.

We conclude that substantial evidence existed to support the district court's conclusion that the Mackintoshes did not exhibit conduct inconsistent with an intent to rescind the contract. "If a party has more than one remedy . . ., his manifestation of a choice of one of them by bringing suit or otherwise is not a bar to another remedy unless the remedies are inconsistent and the other party materially changes his position in reliance on the manifestation." Restatement (Second) of Contracts § 378 (1981).

The Mackintoshes never elected recision as their sole remedy

until the time of trial. Even though the remedies stated in the complaint were inconsistent, no evidence was produced at trial that Cal Fed materially changed its position in reliance upon the fact that the Mackintoshes continued to make payments and some minor improvements to the house. The Mackintoshes made their last principal payment in July 1994, and no payments were made after the Mackintoshes chose recision as their sole remedy at trial in August 1994. The district court concluded that the Mackintoshes continued to make payments in order to protect their credit rating and prevent foreclosure should they lose at trial and that the payments were not evidence that they were affirming the contract. We conclude that the district judge's conclusion was supported by substantial evidence.

*The district court improperly denied the Mackintoshes' request for attorney's fees*

At the conclusion of trial, the Mackintoshes moved for an award of attorney's fees based on the fact that their sales contract stated the following:

> In the event that legal action is instituted by . . . any party to this agreement . . . arising out of the execution of this agreement or sale, . . . the prevailing party shall be entitled to receive from the other party a reasonable attorney fee to be determined by the court in which the action is brought.

The district court refused to award attorney's fees, stating that the rescinded contract was

> void from its date of inception, just as if the contract had never existed. *Bergstrom v. Estate of DeVoe,* [109 Nev. 575, 854 P.2d 860 (1993)]. As recision has been granted in this case, the contract is null and void. Therefore, Plaintiffs may not recover attorneys fees under the terms of a void contract.

We conclude that the district judge's conclusion that attorney's fees were not available pursuant to *Bergstrom* was erroneous. In *Bergstrom,* this court concluded that because a rescinded contract was void *ab initio,* the party who rescinded the contract was precluded from recovering damages for breach because it was as if the contract had never been entered into. *Bergstrom,* 109 Nev. at 577-78, 854 P.2d at 862. Allowing both recision and damages for breach of contract would constitute double recovery. *Id.* at 578, 854 P.2d at 862. However, in *Bergstrom,* we did not address the issue of whether an award of attorney's fees authorized by the contract would be permissible if the contract had been rescinded.

In Katz v. Van Der Noord, 546 So. 2d 1047 (Fla. 1989), the Florida Supreme Court stated:

> We hold that when parties enter into a contract and litigation later ensues over that contract, attorney's fees may be recovered under a prevailing-party attorney's fee provision contained therein even though the contract is rescinded or held to be unenforceable. The legal fictions which accompany a judgment of rescission do not change the fact that a contract did exist. It would be unjust to preclude the prevailing party to the dispute over the contract which led to its rescission from recovering the very attorney's fees which were contemplated by that contract.

*Id.* at 1049.

We agree with this case law. Therefore, we conclude that the district court erred in denying the Mackintoshes' request for attorney's fees, and we remand this case to the district court for reconsideration of this issue consistent with this opinion.

*The district court properly refused to allow the Mackintoshes to present evidence to support a claim for punitive damages*

NRS 42.005(1) establishes the circumstances under which punitive damages are available:

> [I]n an action for the breach of an obligation not arising from contract, where it is proven by clear and convincing evidence that the defendant has been guilty of oppression, fraud or malice, express or implied, the plaintiff, in addition to the compensatory damages, may recover damages for the sake of example and by way of punishing the defendant.

Additionally, we have stated that punitive damages must be based on a cause of action sounding in tort and that compensatory damages must be awarded before the court can award punitive damages. Sprouse v. Wentz, 105 Nev. 597, 602, 781 P.2d 1136, 1138-39 (1989). This is a tort action.

However, we have stated that "punitive damages should not be awarded in the case which initially adopts this new cause of action." Hansen v. Harrah's, 100 Nev. 60, 65, 675 P.2d 394, 397 (1984). This rule precludes an award of punitive damages in this case because the cause of action underlying any award of punitive damages was first adopted by this court in *Mackintosh I*. Therefore, the district court's conclusion that punitive damages were not available in this case was proper.

*The district court properly refused to allow recovery for consequential damages, including damages for emotional distress*

The Mackintoshes argue that the district court erred by refusing to allow them to recover all sums expended in regard to the

real property at issue, including improvements, insurance, and late charges on the principal. The Mackintoshes also argue that the district court erred in failing to award damages for emotional distress. We conclude that the district court did not err.

At the conclusion of trial, the district court awarded the Mackintoshes the amount of their down payment and their principal payments, minus the fair rental value of the house. The Mackintoshes were also reimbursed for the tax expenses they had incurred. However, the Mackintoshes were not reimbursed for "late charge" expenses or for the costs of homeowner's insurance because such insurance was a discretionary expense. The Mackintoshes also were not reimbursed for improvements made to the property because (1) the improvements added no value to the property and (2) the improvements were added in 1986, and the Mackintoshes had enjoyed the improvements for eight years. The district court stated that equitable considerations required that the Mackintoshes not be reimbursed for the improvements. We agree.

> A recision of a contract demands as a general rule the restoration of the status quo of the parties. . . .
>
> To place a party in status quo means to place such party in the same position as he was situated in at the time of the execution of the contract; but absolute and literal restoration of the parties to their former position is not required, and such restoration as is reasonably possible and demanded by the equities of the case is sufficient. Thus, where acts of the other party render a restoration of the status quo impossible, restoration need be made only as nearly as circumstances will permit.

17A C.J.S. *Contracts* § 438 (1963) (footnotes omitted).

### 1. *Damages excluding those for emotional distress*

First, we conclude that the district judge properly concluded that the Mackintoshes were not entitled to reimbursement for homeowner's insurance payments and "late charge" payments. The Mackintoshes argue that they were fraudulently induced into buying the house and, therefore, that they should be reimbursed for these house-related expenditures. However, the purchase of homeowner's insurance was discretionary, and the Mackintoshes were not compelled to buy the insurance. Furthermore, the "late charge" payments resulted from the Mackintoshes' own inability to pay their mortgage on time. Cal Fed was not enriched by these two expenditures, and the district court properly refused to award reimbursement to the Mackintoshes for these costs.

With regard to the improvements, in a recision and restitution situation, a party should be reimbursed for the costs of any improvements made. *See* Garbark v. Newman, 51 N.W.2d 315, 325 (Neb. 1952). *See generally* 66 Am. Jur. 2d *Restitution and Implied Contracts* § 166 (1973). However, the improvements were eight years old, had a limited life use, and had been enjoyed by the Mackintoshes during those eight years. Therefore, we conclude that substantial evidence supported the district court's conclusion that the equities of the case demanded that no damages would be awarded to the Mackintoshes for the improvements.

### 2. *Damages for emotional distress*

At the conclusion of the trial, the district court stated that while it believed that the Mackintoshes had proven that they had experienced emotional distress, it would not award damages for emotional distress because it did not think that Cal Fed could be liable for causing emotional distress when Cal Fed had believed that its actions were legitimate and proper.

The Mackintoshes sought recovery for the intentional infliction of emotional distress, the elements of which are: "(1) extreme and outrageous conduct with either the intention of, or reckless disregard for, causing emotional distress, (2) the plaintiff's having suffered severe or extreme emotional distress and (3) actual or proximate causation." Star v. Rabello, 97 Nev. 124, 125, 625 P.2d 90, 91-92 (1981).

We have stated that damages for intentional infliction of emotional distress can arise from a tort action. *See* Shoen v. Amerco, Inc., 111 Nev. 735, 896 P.2d 469 (1995) (stating that intentional infliction of emotional distress could arise from a tortious discharge). Therefore, because the underlying action is a tort, damages for emotional distress are available. However, because at the time of the sale Cal Fed's nondisclosure was not clearly proscribed by enunciated law, such behavior did not constitute intent or reckless disregard for causing emotional distress. *Star,* 97 Nev. at 125, 625 P.2d at 91-92. Therefore, we conclude that the district court's decision to not award damages for emotional distress was supported by substantial evidence.

### CONCLUSION

The district court properly applied our holding in *Mackintosh I* and concluded that a special relationship existed between the

Mackintoshes and Cal Fed. Additionally, the district court properly refused to award compensatory and punitive damages. However, the district court erred in failing to award attorney's fees to the Mackintoshes. Therefore, we affirm the district court's judgment with the exception of the issue regarding attorney's fees. We remand the case to the district court for imposition of attorney's fees in favor of the Mackintoshes consistent with this opinion.