2003 UT 8

Jack J. GRYNBERG, Celeste C. Grynberg, and L & R Exploration Venture, Plaintiffs and Appellants,

v.

QUESTAR PIPELINE COMPANY, a Utah corporation, Questar Gas Management Company, a Utah corporation, and Questar Energy Trading Company, a Utah corporation, Defendants and Appellees.

No. 20010731.

Supreme Court of Utah.

March 21, 2003.

Rehearing Denied May 7, 2003.

Brent V. Manning, Alan C. Bradshaw, Jack M. Morgan, Salt Lake City, for plaintiffs.

Reha Deal, Susie Inskeep Hindley, Terrie T. McIntosh, Salt Lake City, and Donald I. Schultz, Cheyenne, Wyoming, for defendants.

WILKINS, Justice:

¶1 Jack J. Grynberg, Celeste C. Grynberg, and L & R Exploration (collectively "Grynbergs") appeal the district court's order granting summary judgment to Questar Pipeline Company and its affiliates (collectively "Questar") on all of the Grynbergs' contract and tort claims for breach of several natural gas purchase agreements. We affirm in part and reverse in part.

## FACTUAL AND PROCEDURAL HISTORY

¶2 For over thirty years, Questar has been purchasing, gathering, and/or transporting natural gas owned by the Grynbergs. While heavily regulated when the contracts were signed in 1974, deregulation has since transformed the natural gas industry. Since 1987, Questar and the Grynbergs have been embroiled in multiple lawsuits under the gas purchase agreements governing their relationship. This case is the fifth, and hopefully final, effort to resolve the many disputes that stem from their relationship. We recite the facts of this case, and all reasonable inferences to be drawn therefrom, in the light most favorable to the Grynbergs. *See, e.g., Norman v. Arnold,* 2002 UT 81, ¶2, 57 P.3d 997.

### I. FACTUAL HISTORY

#### A. The Contracts

¶3 The Grynbergs own working interests in natural gas wells located in Wyoming and Colorado. In 1971, the Grynbergs signed a gas purchase agreement with Mountain Fuel Supply Company, predecessor in interest to Questar Pipeline Company, for the sale of gas from the Colorado wells (Colorado Contract). In April and June of 1974, the Grynbergs signed three more gas purchase agreements with Mountain Fuel for the sale of gas from their Wyoming wells (Wyoming Contracts). All four were twenty year contracts, continuing year to year after that if not terminated according to their terms.

¶4 Under the Wyoming Contracts, the ultimate gas price paid by Questar was determined by a formula with three variables: price, volume, and gross heating value (BTU adjustment). The contracts obligated Questar to gather, measure, analyze, and transport the natural gas they were purchasing, and to provide monthly statements and payments to the Grynbergs. Questar's responsibilities also included measuring the volume and gross heating value of the gas according to formulas set forth in the contracts and performing regular equipment tests. The Grynbergs were authorized to demand periodic equipment tests and to participate in all gas or equipment tests performed routinely or on demand.

¶5 The Colorado Contract was terminated January 1, 1992. After raising concerns about Questar's adherence to take-or-pay obligations under the Colorado Contract, the Grynbergs signed a new, 96-day gas purchase agreement with Questar on February 11, 1992 that contained a general settlement and release of all claims from the Colorado Contract. Questar attempted to terminate the Wyoming Contracts on June 28, 1993, and again on January 1, 1994; the final termination date, however, remains in dispute.

¶6 Sometime after Questar's attempted termination of the Wyoming Contracts, the Grynbergs contracted with their well operator, Hunt Oil Company (Hunt), to sell the natural gas from the Wyoming wells on their behalf. Hunt, in turn, contracted with Questar affiliates to purchase, gather, and/or transport the natural gas from the Wyoming wells (Hunt Contracts). According to the Grynbergs, Questar affiliates purchased natural gas from the Wyoming wells through the end of 1997, and continue to gather and transport natural gas from the Wyoming wells to this day.

#### B. Prior Litigation

##### 1. Questar I

¶7 In 1987, the Grynbergs brought their first suit against Questar in Wyoming federal

district court under all four contracts (Questar I). The complaint alleged, inter alia, fraud, misrepresentation, conversion, and breach of contract based upon take-or-pay obligations, and covered gas sales transactions from 1974 through 1988. The parties eventually settled this case, agreeing to a mutual general release of all claims before December 1988.

### 2. Questar II

¶ 8 In 1992, Questar brought a declaratory judgment action in Wyoming federal district court to determine the appropriate price, after deregulation, of natural gas sold under the Colorado and Wyoming Contracts (Questar II). The Grynbergs counterclaimed, alleging intentional interference with contractual relations, breach of the duty of good faith and fair dealing, and numerous breaches of contract including failing to take or pay, underreporting gas volume, and making gas payments "using incorrect btu adjustments."

¶ 9 The district court granted Questar's summary judgment motion on the Grynbergs' claim that Questar was "stealing gas," but allowed the remaining claims to go to trial. After discovery, and immediately before the trial was to begin, the Grynbergs informed Questar and the court that the "incorrect [BTU] adjustment" claim was far greater than previously understood. In a February 28, 1994 hearing, the district court stated that it "would construct a dismissal [of the BTU claim] in this case without prejudice," allowing the parties to resolve the BTU adjustment issue in another suit. However, it was not until October 1, 1998 that the district court issued a final order dismissing without prejudice "defendants' claim against plaintiff for paying for gas using incorrect [BTU] adjustments (the [BTU] claims)."

¶ 10 The deregulation price question and all remaining counterclaims were tried before the jury, who returned a verdict for the Grynbergs on all counts. Four years later, after Questar's request for judgment as a matter of law, the district court reduced the jury's deregulation price determination and granted judgment for Questar on all of the Grynbergs' counterclaims. The Tenth Circuit reversed the district court's price reduc-

tion and substantially reinstated the jury verdict in *Questar Pipeline Co. v. Grynberg,* 201 F.3d 1277, 1281 (10th Cir.2000). A final judgment following remand was entered March 20, 2000.

### 3. Questar III

¶ 11 A third lawsuit was filed in Wyoming federal district court by the Grynbergs against Questar in 1997, alleging pricing and take-or-pay claims under the four contracts for the time period following Questar II (Questar III). The suit was filed to preserve claims that would otherwise be barred by the four-year statute of limitations for gas sales in Wyoming, and does not include the BTU adjustment claim from Questar II.

¶ 12 Questar moved for summary judgment, seeking a determination of the Wyoming Contracts' termination date. On December 11, 1998, the district court granted partial summary judgment to Questar, ruling that the Wyoming Contracts terminated on July 1, 1994 (Termination Ruling). No final judgment has been issued in that case.

## II. PROCEDURAL HISTORY

¶ 13 The current case against Questar was filed by the Grynbergs in Utah's Third District Court on September 29, 1999 (Questar IV). The first amended complaint alleges in detail improper measurement and analysis of the gross heating content of natural gas under the Wyoming Contracts, and also alleges that Questar fraudulently induced the Grynbergs to release all claims under the Colorado Contract. The complaint sets forth nine causes of action under the Wyoming and Hunt Contracts: (1) breach of contract by incorrectly measuring and analyzing the gross heating content of the gas; (2) declaratory judgment of the correct BTU adjustment; (3) negligent or intentional misrepresentation of the incorrect BTU adjustments; (4) fraud in the mismeasurement and misanalysis of the BTU adjustments; (5) common carrier liability for incorrect BTU adjustments; (6) conversion through incorrect BTU adjustments; (7) res ipsa loquitur and negligence in the mismeasurement of BTU adjustments; (8) breach of fiduciary duty by

incorrect BTU adjustments; and (9) equitable remedies for incorrect BTU adjustments (injunction, accounting, quantum meruit, and unjust enrichment). A tenth cause of action is asserted under the Colorado Contract: (10) failure to take or pay under the contract and fraudulent inducement or mutual mistake in the settlement and release of all claims from the contract.

¶ 14 Questar moved to dismiss the first amended complaint, arguing that the claims are barred by the applicable statutes of limitation, the U.C.C. "savings" statute, the economic loss doctrine, the lack of any contract or tort duties, and/or the failure to properly plead the claims. Upon receiving multiple memoranda and extraneous materials submitted by both parties, and after hearing oral argument on the matter, the district court chose to treat the motion to dismiss as a motion for summary judgment pursuant to Utah Rules of Civil Procedure 12(b) and 56.

¶ 15 The district court granted summary judgment in favor of Questar for all claims. In its order, the district court first denied the Grynbergs' request to postpone the ruling to conduct discovery because the Grynbergs failed to demonstrate how additional discovery would assist them. Then, relying on the partial summary judgment ruling from Questar III, the district court determined that the Wyoming Contracts terminated on July 1, 1994, and that the actions based on those contracts are barred by the four-year U.C.C. statute of limitations. Next, the court found that there were no genuine issues of material fact regarding the Grynbergs' fraudulent concealment claim, and that the claim is time-barred because the Grynbergs had notice of Questar's alleged misconduct by early 1995. The district court also found that the six-month U.C.C. Article 2 savings statute applies in this case, not the more general one-year savings statute, and that, therefore, the claims from Questar II are time-barred. Lastly on the issue of pre–1994 contract claims, the district court held that the Grynbergs' current BTU claims had not been pled in Questar II and could not "relate back" for purposes of a savings statute.

¶ 16 Next, the district court held that all pre–1994 tort claims were barred by the economic loss doctrine. As to fraud, misrepresentation, and concealment as possible exceptions to the economic loss doctrine, the court found that the claims were time-barred because the Grynbergs had actual notice by early 1995, and that the claims did not "relate back" to Questar II. The court also found that common carrier liability is not applicable to natural gas pipelines, and dismissed with prejudice the Grynbergs' fifth cause of action.

¶ 17 Regarding post–1994 claims, the district court ruled that they are "barred in part by the statute of limitations, in their entirety by the economic loss doctrine," and furthermore by the lack of any "sound contractual or tort duty" upon which the Grynbergs could base their claims. Specifically, the district court held that there was insufficient factual support for third party beneficiary status, a fiduciary relationship, or a conversion claim after 1994.

¶ 18 Finally, on all claims related to the Colorado Contract, the court noted additional reasons for dismissal: the applicable statutes of limitation and the lack of any genuine issue of material fact regarding enforceability of the binding settlement and release.

¶ 19 The Grynbergs appeal.

## STANDARD OF REVIEW

¶ 20 When reviewing a summary judgment by the district court, we must examine all of the facts presented and the inferences to be drawn therefrom in the light most favorable to the nonmoving party. If there is no genuine issue as to any material fact, and the moving party is entitled to judgment as a matter of law, then summary judgment is appropriate. Utah R. Civ. P. 56(c). We grant no deference to the district court's conclusions of law and review them for correctness. *Norman v. Arnold*, 2002 UT 81, ¶ 15, 57 P.3d 997.

## ANALYSIS

### I. TERMINATION DATE OF WYOMING CONTRACTS

¶ 21 The Grynbergs' first argument on appeal is that the district court committed

clear error when it gave prejudicial effect to the Termination Ruling in Questar III. According to the Grynbergs, the Wyoming Contracts were never properly terminated, and the earliest date upon which termination could have occurred was January 1, 1996. A district court's application of res judicata presents a question of law, which we review for correctness. *Miller v. USAA Cas. Ins. Co.*, 2002 UT 6, ¶ 19, 44 P.3d 663.

¶ 22 In its order granting summary judgment for defendants, the district court first acknowledged that the Termination Ruling of Questar III was a non-final, interlocutory order not yet subject to appeal because no final judgment had been entered in the case. The district court then stated, with no further discussion or analysis, that "[b]ased on the December 11, 1998 [Termination R]uling, Plaintiffs' contract claims are barred by the four-year U.C.C. statute of limitations." With this ruling, the district court barred the Grynbergs from relitigating the issue of when the Wyoming Contracts terminated.

■ ¶ 23 Whether to apply the conclusions of the Wyoming federal district court to this case is a question of issue preclusion. To prevent relitigation of an issue in a subsequent action,

"(i) the party against whom issue preclusion is asserted must have been a party to or in privity with a party to the prior adjudication; (ii) the issue decided in the prior adjudication must be identical to the one presented in the instant action; (iii) the issue in the first action must have been completely, fully, and fairly litigated; and (iv) the first suit must have resulted in a final judgment on the merits."

*Collins v. Sandy City Bd. of Adjustment*, 2002 UT 77, ¶ 12, 52 P.3d 1267 (internal citation omitted). Insofar as the contracts are the same, the attempted termination letters are the same, and the parties are the same, there does not appear to be any question that the first two requirements are met. Based on the limited record before us, it also appears that the issue was fully and fairly litigated before the Questar III court issued its partial summary judgment order.

¶ 24 However, a partial summary judgment issued during a trial still pending in Wyoming is not a final judgment on the merits. As noted by the district court, the order was non-final and not yet subject to appeal "because no final judgment had been entered in the case." The Termination Ruling, therefore, may not operate to preclude the parties in this case from raising the issue of the Wyoming Contracts' termination date. Any ruling on the termination date of the Wyoming Contracts would be premature without additional evidence or a final judgment from the district court in Questar III. While not clearly presented as such by the parties, upon reflection we find that the termination date is a disputed issue of material fact that precludes summary judgment.

¶ 25 Furthermore, if there was still a contract between the parties after September 25, 1995, those breach of contract claims would be timely because there is a four-year statute of limitations on contract claims. Utah Code Ann. § 70A–2–725(1) (2001). It is unclear from the record before us when the Hunt Contracts began, and exactly what those contracts governed. Therefore, we must remand for the district court to determine if the Grynbergs have any valid contract claims between September 25, 1995 and the initiation of the Hunt Contracts which severed the direct contractual relationship between Questar and the Grynbergs.

## II. QUESTAR II CLAIMS

¶ 26 Turning to the district court's rulings on pre–1994 Questar II claims, we first address the savings statute arguments; secondly, the arguments concerning accrual of a cause of action; and, finally, the application of the economic loss doctrine. We note at the outset that arguments concerning the relation back doctrine and the tort claims allegedly originating in Questar II are moot as a consequence of our analysis of the economic loss doctrine.

### A. The Savings Statutes

¶ 27 The district court ruled that, since this case involved a U.C.C. Article 2 contract for the sale of goods, the six-month savings provision of Utah Code Ann. section 70A–2–725(3) (2001) applied to the incorrect BTU

adjustment claim pled in Questar II. The Grynbergs argue on appeal that (1) the one-year savings provision of Utah Code Ann. section 78–12–40 (2002) applies to the claims from Questar II and is not trumped by section 70A–2–725; (2) the savings period began to run on March 20, 2000, after the final judgment of Questar II was entered; (3) the statute of limitations has accrued anew under Wyoming Statutes Ann. section 1–3–119 (Michie 2002); (4) a cause of action has not yet accrued and the statute of limitations not yet begun to run; and (5) section 70A–2–725 does not apply to the tort claims.

¶ 28 We review the district court's statutory interpretations for correctness. *Davis County Solid Waste Mgmt. v. City of Bountiful*, 2002 UT 60, ¶ 9, 52 P.3d 1174. We look first to the statute's plain language as evidence of the legislature's intent, and give effect to that plain language unless the statute is ambiguous. *Id.* at ¶ 10. "We analyze the language of a statutory provision in light of other provisions within the same statute or act, and we attempt to harmonize the provisions in accordance with the legislative intent so as to give meaning to each provision." *Id.*

¶ 29 In challenging the district court's application of the six-month U.C.C. savings statute, the Grynbergs first argue that a plain language reading dictates application of section 78–12–40, the general one-year savings statute. Utah's general savings statute suspends enforcement of the statute of limitation for one year on any action that is timely brought but where "the plaintiff fails in such action or upon a cause of action otherwise than upon the merits" after the statute of limitations has expired. § 78–12–40. In comparison, under the U.C.C. six-month savings statute (which only applies to Article 2 contracts), if an action is timely brought but "is so terminated as to leave available a remedy by another action for the same breach" a party has six months to bring another action. § 70A–2–725(3).

¶ 30 According to the Grynbergs, the use of the word "action" in the U.C.C. six-month statute, compared to the use of both "action" and "cause of action" in the one-year statute, indicates that the U.C.C.

six-month statute must apply only to the dismissal of an entire lawsuit, and not a single claim. However, unlike the general savings statute, which does not define "action," the U.C.C. savings statute provides a definition: " 'Action' in the sense of a judicial proceeding includes recoupment, counterclaim, setoff, suit in equity, and any other proceedings in which rights are determined." § 70A–1–201(1). When a term is defined within the statute, we look to that definition for guidance when interpreting the statute rather than revert to the "ordinary and accepted meaning" of the term. *Utah State Bar v. Summerhayes & Hayden*, 905 P.2d 867, 871 (Utah 1995). Here, an "action" includes proceedings that may occur as subparts of a larger action or as additional claims that may be resolved prior to the termination of the entire lawsuit. We find that the U.C.C. statute is meant to apply to a single claim that is dismissed from a larger action when there is "available a remedy by another action" for that claim. By including this definition, the statute does not need to provide the more explicit "cause of action" language that is used in the one-year savings statute.

¶ 31 To the extent that there could be a conflict between the two statutes, we are also persuaded by the reasoning in *Perry v. Pioneer Wholesale Supply Co.*, 681 P.2d 214, 216 (Utah 1984), which states that "[w]hen two statutory provisions appear to conflict, the more specific provision will govern over the more general provision." *See also Portwood v. Ford Motor Co.*, 183 Ill.2d 459, 233 Ill.Dec. 828, 701 N.E.2d 1102, 1105–06 (1998) (holding that Illinois' more specific, six-month, U.C.C.-based savings statute trumps the more general one-year savings statute). The one-year savings statute applies to all actions, tort and contract, while the six-month statute applies only to actions for breach of contracts for the sale of goods. Application of this principle is bolstered when one considers the purpose behind the U.C.C., which is to simplify, clarify, and unify the laws governing commercial transactions. To apply a six-month savings provision to contract actions that are terminated in their entirety and a one-year savings provision to

individual contract claims that are dismissed from an ongoing lawsuit would substantially defeat the underlying purpose of the U.C.C.

■ ¶ 32 The Grynbergs also argue that the time for commencement of the savings statute provisions did not begin until the final judgment in Questar II was entered after appeal. The Grynbergs apply the same definition of "action" in this argument as they do in their first argument, and insist that the entire lawsuit must terminate before the savings statute time period begins to run. Since we hold that an "action" under section 70A–2–725 includes individual claims or causes of action, it must follow that when an individual claim or cause of action is terminated so that another action may provide a remedy, the statutory grace period begins to run at the moment of termination. In this case, that moment occurred on October 1, 1998, when the court in Questar II issued its order dismissing the BTU adjustment claim without prejudice, not on March 20, 2000, when the final judgment after appeal was entered in Questar II. The remaining claims in Questar II did not deal with the BTU adjustment issue, and would have been unaffected by a separate trial on the BTU adjustment claim. While we do not argue with the rule that "if dismissal of a first action is appealed, [the savings statute's] extension of time for filing a second action runs from the date of the dismissal's affirmance," the dismissal in Questar II was never appealed. *Madsen v. Borthick*, 769 P.2d 245, 254 (Utah 1988). Thus, the holding in *Madsen* does not apply here. Since the Grynbergs failed to bring their new BTU adjustment contract claims by April 1, 1999, when the six-month savings statute expired, their Questar II contract claims are now time-barred.

### B.  Accrual of a Cause of Action

■ ¶ 33 The Grynbergs' next challenge is based upon Wyoming Statutes Ann. section 1–3–119 (Michie 2002), which reads: "When payment has been made upon any demand founded on contract or a written acknowledgment thereof, or promise to pay the same has been made and signed by the party to be charged, the time for commencing an action runs from the date of such payment, acknowledgment or promise." Under Wyoming law, according to the Grynbergs, their cause of action against Questar for improper BTU adjustments under the Wyoming Contracts accrued anew when Questar paid the final judgment from Questar II in 2000 and 2001.

■ ¶ 34 Essential to the operation of this statute is that the payment, acknowledgment, or promise is voluntary, and represents an admission that the debtor has not yet upheld the terms of the bargain. A part payment may act as an acknowledgment that the debtor still owes on an existing moral obligation under a contract that is no longer legally enforceable. *See, e.g., Inv. & Sec. Co. v. Bunten*, 56 Wyo. 77, 103 P.2d 414, 417–20 (1940); *Union Stockyards Nat'l Bank v. Maika*, 16 Wyo. 141, 92 P. 619, 621 (1907). Only after a debtor willingly ignites the coals of a former debt will the courts toll application of the statute of limitations.

¶ 35 It would be improvident, to say the least, to hold that a litigant's proffer of part payment of a final judgment for one claim acts as a voluntary acknowledgment that the litigant is still morally obligated under a separate claim being litigated elsewhere. There is nothing in the record to indicate that Questar intended the payments as part satisfaction of the disputed BTU adjustments, nor that the payments were anything more than a voluntary acknowledgment that the court had rendered judgment against them on the price and volume claims. Questar's payments pursuant to judicially determined obligations, specifically the price and volume adjustments for gas under the Wyoming Contracts, do not operate as voluntary acknowledgments of a remaining obligation for improper BTU adjustments.

■ ¶ 36 Finally, the Grynbergs argue that the statute of limitations has not yet begun to run because no "final determination" of the correct BTU adjustment pursuant to the Wyoming Contracts has been made, no breach of the contracts has occurred and, therefore, no cause of action has accrued. In the alternative, the Grynbergs argue that no damage occurred prior to the 2000 and 2001 Questar II payments which

used allegedly incorrect BTU adjustments. Both of these arguments require us to determine the intent of the parties to the contracts as found in the plain language of the documents. *Wagner v. Clifton*, 2002 UT 109, ¶ 12, 62 P.3d 440. This court interprets unambiguous contracts as a matter of law. *Id.*

¶ 37 According to the Grynbergs, under the "unique provisions of the Contracts" a breach cannot occur until there is a "final determination of the correct volume or values involved" in each monthly statement. We are unable to find any such language in the Wyoming Contracts, particularly in the sections cited by the Grynbergs. Instead, we find merely a type of dispute resolution, an opportunity and mechanism for correcting errors in Questar's monthly billing statements and payments. "Any errors in such statement or payment shall be promptly reported to [Questar], and [Questar] shall make proper adjustment thereof within thirty (30) days after final determination of the correct volume or values involved." This language assigns to Questar the duty to correct any errors, and implicates only Questar and the Grynbergs in the "final determination." It is the resolution *by the parties* of any disputed statements or payments that is involved here. There is no language indicating that a "final determination" is the exclusive precursor to contractual breach.

¶ 38 The Grynbergs undermine much of their case when they assert that "no damage occurred" prior to Questar's 2000 and 2001 Questar II payments. If their argument is sound, the Grynbergs should bring suit for a declaratory judgment seeking determination of the correct BTU adjustments. The judicial determination would be the "final determination," according to the Grynbergs' interpretation of the contract. Payment pursuant to the judicial "final determination" could not constitute a breach of the contract because it would be in accordance with the terms of the contract. Consequently, there could never be a breach of the contract for improper BTU adjustments. Surely this is not what the parties had in mind. We cannot find that Questar's monthly billing statements and payments based upon allegedly incorrect BTU adjustments were not a breach when

they first occurred, but that Questar's payments after a judicial determination of gas price and volume, which used the same allegedly incorrect BTU adjustments, were a breach of the Wyoming Contracts. Thus, it is the original monthly payments by Questar based upon incorrect BTU adjustments that would be the proper basis for a breach of contract action.

¶ 39 As to the Grynbergs' alternative argument, it too fails. The 2000 and 2001 payments by Questar, which the Grynbergs allege use incorrect BTU adjustments, use the same BTU adjustments from Questar's monthly payments to the Grynbergs. The Grynbergs have already been harmed by these incorrect BTU adjustments—a harm was incurred each month that payment was rendered under the contracts. The 2000 and 2001 payments, if anything, were merely a repeat of the same breach that has already occurred. They do not, however, toll the statute of limitations. As noted above, a partial payment pursuant to court order is not an intentional, voluntary acknowledgment of a prior debt—nor can it amount to breach of a contract.

### C. The Economic Loss Doctrine

¶ 40 The district court ruled that the economic loss doctrine barred all tort claims, both before and after the Wyoming Contracts were allegedly terminated. The Grynbergs argue that the economic loss doctrine does not apply to intentional torts or torts based upon independent duties, and that, in the context of post–1994 tort claims, it is illogical to find that no contracts exist between themselves and Questar while simultaneously finding that the economic loss doctrine bars all tort claims. We note at the outset that the parties agree that Wyoming law governs the Wyoming Contracts. The district court's interpretation and application of the economic loss doctrine in this case is a question of law which, as we discussed above, this court reviews for correctness, granting no deference to the district court's conclusions. *Hermansen v. Tasulis*, 2002 UT 52, ¶ 10, 48 P.3d 235.

¶ 41 While Wyoming has not addressed the precise issues raised in this case,

it has clearly adopted the rule that when a conflict arises between parties to a contract regarding the subject matter of that contract, "the contractual relationship controls, and parties are not permitted to assert actions in tort in an attempt to circumvent the bargain they agreed upon." *Snyder v. Lovercheck,* 992 P.2d 1079, 1087 (Wyo.1999) (barring a negligent misrepresentation claim in dispute over purchase of real estate); *see also Cowardin v. Finnerty,* 994 P.2d 335, 338–39 (Wyo.1999) (barring breach of implied covenant of good faith and fair dealing claim in case involving a real estate lease-purchase agreement); *Kirby v. NMC/Continue Care,* 993 P.2d 951, 954–55 (Wyo.1999) (barring negligence claim in case for breach of contract for sale of goods). Whether the doctrine is asserted in terms of economic loss or independent duty, the underlying reasoning remains the same: tort law should govern the duties and liabilities imposed by legislatures and courts upon non-consenting members of society, and contract law should govern the bargained-for duties and liabilities of persons who exercise freedom of contract. *Snyder,* 992 P.2d at 1087–88.

¶ 42 Originating in products liability cases, the economic loss doctrine requires that contract law define the remedy when the loss is strictly economic, i.e., when no damage occurs to persons or property other than the product in question. *See, e.g., Cont'l Ins. v. Page Eng'g Co.,* 783 P.2d 641, 647 (Wyo.1989) ("[T]his kind of loss relates essentially to the purchaser's benefit of the bargain which has been made between himself and the seller. The authorities recognize that the law of contracts is far better suited to deal with the dissatisfaction on the part of a purchaser under such circumstances."); *Town of Alma v. Azco Constr. Inc.,* 10 P.3d 1256, 1259–62 (Colo.2000). Focusing on the character of the harm, however, made it difficult to apply the economic loss doctrine beyond the realm of products liability, where torts such as fraud and conversion exist to remedy purely economic losses in non-contractual settings. *See, e.g., SME Indus., Inc. v. Thompson, Ventulett, Stainback & Assocs., Inc.,* 2001 UT 54, ¶ 32 & n. 8, 28 P.3d 669 (stating, in the context of a professional negligence and construction contract case, "the economic loss rule holds that 'economic damages are not recoverable in negligence absent physical property damage or bodily injury' " and noting that plaintiffs may be able to recover economic loss damages in intentional tort cases like fraud (quoting *Am. Towers Owners Ass'n v. CCI Mech.,* 930 P.2d 1182, 1189 (Utah 1996))); *Town of Alma,* 10 P.3d at 1262–63; Amanda K. Esquibel, *The Economic Loss Rule and Fiduciary Duty Claims: Nothing Stricter than the Morals of the Marketplace?,* 42 Vill. L.Rev. 789, 843–46 (1997).

¶ 43 Nonetheless, many courts have successfully translated the theory by recognizing and applying the underlying premise of the economic loss doctrine: successful separation of contract and tort law requires identification of the underlying duties governing the parties' relationship. *Snyder,* 992 P.2d at 1087–88; *see also Town of Alma,* 10 P.3d at 1263–64; *Aas v. Superior Court,* 24 Cal.4th 627, 101 Cal.Rptr.2d 718, 12 P.3d 1125, 1135 (2000); *Ford Motor Credit Co. v. Suburban Ford,* 237 Kan. 195, 699 P.2d 992, 998–99 (1985). Contractual duties exist by mutual agreement of the parties, while tort duties exist by imposition of society; the modern focus is not on the harm that occurs but instead is on the source of the duty that was breached. Using the historical language of economic loss and alluding to products liability cases is deceptive and turns the focus away from the core reasoning of the Wyoming court—that once there is a contract, any tort claim must be premised upon an independent duty that exists apart from the contract. All contract duties, and all breaches of those duties—no matter how intentional—must be enforced pursuant to contract law.

¶ 44 In *Isler v. Texas Oil & Gas Corp.,* the Tenth Circuit applied New Mexico law to a case involving rental payments on a federal oil and gas lease. 749 F.2d 22, 24 (10th Cir.1984). The court held that the judgment based on tort must be dismissed because the facts alleged in the tort and contract claims were the same and the contract defined the relevant rights and duties of the parties. *Id.* In an oft-cited opinion, the court set out the reasoning behind the modern economic loss rule, reminding us that "[i]mportant to the

vitality of contract is the capacity voluntarily to define the consequences of the breach of a duty before assuming the duty." *Id.* at 23. The Tenth Circuit's decision was controlled by *Rio Grande Jewelers Supply Inc. v. Data General Corp.*, 101 N.M. 798, 689 P.2d 1269, 1270–71 (1984), where the New Mexico Supreme Court held that a tort claim for negligent misrepresentation lay in direct conflict with the U.C.C. and principles of freedom of contract, and was disallowed as simply an attempt to rewrite the contract and avoid the consequences of contract law.

¶ 45 In *Snyder,* the Wyoming Supreme Court explicitly adopted the reasoning of *Isler.* The court quoted at length from *Isler* in a ruling that makes clear their endorsement of both the reasoning and result reached by the Tenth Circuit. We recite only a small portion of the quoted passage to reiterate the reasoning of that opinion:

> "The effect of confusing the concept of contractual duties, which are voluntarily bargained for, with the concept of tort duties, which are largely imposed by law, would be to nullify a substantial part of what the parties expressly bargained for—limited liability.... No reason appears to support such a radical shift from bargained-for duties and liabilities to the imposition of duties and liabilities that were expressly negated by the parties themselves when they decided to abandon their status as legal strangers and define their relationship by contract."

*Snyder,* 992 P.2d at 1087 (quoting *Isler,* 749 F.2d at 23). The *Snyder* court then noted that the economic loss doctrine thus stated has also been adopted by the Kansas Supreme Court in *Ford Motor Credit,* and paraphrased the rule as follows: "when parties' difficulties arise directly from a contractual relationship, the resulting litigation concerning those difficulties is one in contract no matter what words the plaintiff may wish to use in describing it." *Snyder,* 992 P.2d at 1088 (internal citation omitted).

¶ 46 The first amended complaint filed by the Grynbergs in this case asserts nine claims based on the Wyoming Contracts. The first cause of action alleges that "[b]y mismeasuring and wrongly analyzing the heating content of the gas, Defendants have breached the [Wyoming] Contracts." The six tort claims also allege mismeasurement and/or wrongful analysis of the heating content, the same conduct that is asserted in the contract claim. To prevail, the Grynbergs must provide some authority to support a duty or obligation that is not subsumed by, but exists independent of, the contracts.

¶ 47 The Wyoming Contracts set forth in detail the respective duties and liabilities of the parties: as part of their agreement to purchase the Grynbergs' gas, Questar voluntarily assumed the duty of measuring and analyzing the heat content of the gas. Questar also became contractually obligated to submit monthly billing statements prior to their monthly payments for gas purchased. The contracts further provide, in great detail, formulae and specifications for measuring and analyzing the heat content of the gas and determining proper BTU adjustments to the final price of the gas. By voluntarily assuming these special contractual duties, Questar simultaneously assumed liability—per contract law—for failure to perform these duties. The Grynbergs have failed to provide any relevant and persuasive authority for the imposition of extra-contractual tort duties in this case.

¶ 48 The Grynbergs first argue that the economic loss rule only applies to negligence-based, not intentional, tort claims, and they cite *Town of Alma, Snyder,* and *American Towers Owners Ass'n* to support this proposition. It is true that all three of these cases state that fraud may be an exception to the economic loss rule, but they do not support the conclusion that, therefore, only negligence claims are excluded. *Town of Alma* simply holds that some common law tort claims may fall outside the scope of the economic loss rule when the claim "is based upon a recognized independent duty of care," an observation that does not conflict with our holding in this case. 10 P.3d at 1263. *Snyder* holds that the merger or disclaimer clauses of a contract do not preclude a claim for fraudulent inducement. 992 P.2d at 1086. This holding is based upon an independent tort duty, recognized by the courts of Wyo-

ming and several other states, whereby a party who fraudulently induces another to enter into a contractual relationship may be held liable in tort for that fraud. However, the court did not allow a negligent misrepresentation theory to stand for the same behavior. *Id.* at 1087. In essence, the duty to avoid fraudulent pre-contractual conduct remedies a public policy concern that Wyoming and other states will not allow contract law to override. This duty simply does not apply in our case.

¶ 49 Next, the Grynbergs cite a footnote from *American Towers Owners Ass'n* wherein the Utah Supreme Court noted that economic losses may be recovered in intentional tort cases such as fraud or intentional interference with contract. 930 P.2d at 1190 n. 11. It is unclear whether Utah followed the independent duty reasoning of the Wyoming courts when this case was decided. The language of *American Towers Owners Ass'n* and *SME Industries,* two Utah construction cases, relied upon the products liability-based language of economic loss. In *Hermansen v. Tasulis,* we expressly adopted the independent duty-based rule articulated in *Town of Alma* and held that "the initial inquiry in cases where the line between contract and tort blurs is whether a duty exists independent of any contractual obligations between the parties." 2002 UT 52 at ¶¶ 16–17, 48 P.3d 235. Since they were decided before we adopted Colorado's interpretation, and Wyoming clearly follows the independent duty interpretation found in *Town of Alma,* we do not find *American Towers Owners Ass'n* and *SME Industries* persuasive authority regarding the current state of the economic loss rule in Wyoming or Utah.

¶ 50 The Grynbergs then cite several Oklahoma cases to support their assertion that the right to pursue intentional tort claims against pipeline companies is particularly important. Oklahoma law is readily distinguishable, as those courts have chosen to apply overriding common law duties to the performance of contracts. *Woods Petroleum Corp. v. Delhi Gas Pipeline Corp.,* 700 P.2d 1023, 1027 (Okla.Ct.App.1983) ("Accompanying this contract is a common law duty to perform the thing agreed to be done with care, skill, reasonable expediency and faithfulness. The negligent failure to perform these duties constitutes a tort as well as a breach of contract."). We can find no example of Wyoming recognizing a similar independent duty.[1]

¶ 51 The Grynbergs' arguments as a whole, while not inaccurate, are incomplete. According to the Grynbergs, the economic loss rule does not *bar* tort claims, whether they be intentional or merely negligent. This court does not dispute that assertion, but instead offers a clarification: the economic loss rule does not bar tort claims when those tort claims *are based on a duty independent of those found in the contract.* In arguing for common carrier liability and breach of fiduciary duty, the Grynbergs appear to realize the importance of identifying an independent duty. However, even accepting the Grynbergs' allegations as true, there is insufficient evidence in the record to support a finding of common carrier liability or other fiduciary obligations. The Grynbergs do not provide any evidence of when in the history of industry deregulation Questar could have or did become a common carrier, nor do they provide any evidence of conduct by Questar, as an alleged common carrier, that might give rise to a heightened duty towards the Grynbergs. In addition, the

1. On the contrary, the only citation to *Woods Petroleum* by the Wyoming Supreme Court occurs in a special concurrence wherein Justice Urbigkit reasserts his objection to the court's interpretation of the economic loss rule in *JBC of Wyoming Corp. v. City of Cheyenne,* 843 P.2d 1190, 1197 (Wyo.1992) ("[I]t is not our policy to recognize tort actions for purely economic damages."), and *Continental Insurance v. Page Engineering,* 783 P.2d 641 (Wyo.1989). *JBC of Wyoming Corp.,* 843 P.2d at 1198–1200 (Urbigkit, J., specially concurring). In fact, we note that greater culpability has not swayed the Wyoming Supreme Court from its decision to deny recoveries in tort for purely economic losses, as demonstrated by the holding of *Continental Insurance.* In that case, the court refused to permit recovery for economic losses under a failure to warn theory. 783 P.2d at 650 ("The rejection of recovery for pure economic loss under theories of negligence and strict liability, however, has not been because of the absence of culpability, but because of the policy that economic loss is better adjusted by contract rules than by tort principles.").

Grynbergs fail to show how a gas purchaser like Questar, who takes title to the gas at the point of delivery and subsequently gathers and transports it elsewhere, might owe a working interest owner a fiduciary duty under that purchase agreement.

¶ 52 To support their conversion claims, the Grynbergs refer us to four Wyoming cases in which gas or oil interest holders were allowed to pursue a cause of action in conversion. *Amoco Prod. Co. v. EM Nominee P'ship*, 2 P.3d 534 (Wyo.2000); *ANR Prod. Co. v. Kerr–McGee Corp.*, 893 P.2d 698 (Wyo.1995); *Ferguson v. Coronado Oil Co.*, 884 P.2d 971 (Wyo.1994); *Young v. Young*, 709 P.2d 1254 (Wyo.1985). While these cases appear on the surface to be inconsistent with the clear holding of the Wyoming Supreme Court in *Snyder, Cowardin,* and *Kirby,* none of them raise or apply the economic loss doctrine. Additionally, *ANR Production Co.* is unpersuasive because the court clearly found that there was no "preexisting legal relationship for the sale of the hydrocarbons" that were allegedly converted. 893 P.2d at 705. In the absence of contractual duties governing the hydrocarbons in question, the plaintiff resorted to common law tort duties. The same flaw appears in *Amoco Production Co.*, where the court allowed a conversion claim when there were no contractual rights or duties governing reimbursement of the royalties at issue and the right to set-off proceeds. 2 P.3d at 542–43. Finally, we note that the same reasoning applies to bar a conversion claim as bars a fraudulent performance claim: failure to properly perform a duty assigned by the contract is a breach of that contract and nothing more. We elect to follow the clear mandate of the Wyoming Supreme Court in the cases that do engage the economic loss doctrine, and we apply the law of Wyoming as it appears today.

¶ 53 We believe that proper application of the economic loss doctrine in this case leads to the conclusion that all of the Grynbergs' tort claims are barred. The Grynbergs have provided no authority for the proposition that Wyoming recognizes independent tort duties of the sort alleged here when the contract prescribes identical duties. The fact that the exact same conduct is de-scribed in both the contract and tort claims, and the exact same facts and circumstances are at play, is indicative of the overlapping duties in this case. Furthermore, we are influenced by the nature of the parties and contracts at issue: here are two sophisticated business parties agreeing to buy and sell goods in a commercial contract. Strict application of the economic loss doctrine is even more appropriate in cases involving the Uniform Commercial Code. *Moorman Mfg. Co. v. Nat'l Tank Co.,* 91 Ill.2d 69, 61 Ill.Dec. 746, 435 N.E.2d 443, 447, 453 (1982). In conclusion, we hold that the economic loss doctrine bars all of the Grynbergs' tort claims under the Wyoming Contracts.

## III. POST–HUNT CONTRACTS CLAIMS

¶ 54 The Grynbergs' arguments regarding the time period following the Hunt Contracts are twofold. First, the Grynbergs argue that they are third party beneficiaries to the Hunt Contracts with standing to enforce the terms of those contracts. Second, as an alternative to third party beneficiary status, the Grynbergs argue that the economic loss doctrine cannot bar their tort claims when there is no contract governing the relationship. We address these arguments in turn.

### A. Third Party Beneficiary Status

¶ 55 The foundation for third party beneficiary status proffered by the Grynbergs is a sample gas gathering agreement. The Grynbergs argue that the Hunt Contracts contain similar provisions, thus rendering the Grynbergs intended beneficiaries of the Hunt Contracts. The Grynbergs also argue that the district court erred in granting summary judgment for Questar without first allowing discovery on the issue. We address the second issue first.

¶ 56 We review a district court's rule 56(f) discovery rulings for abuse of discretion. *Price Dev. Co. v. Orem City,* 2000 UT 26, ¶ 9, 995 P.2d 1237. An unambiguous contract may be interpreted by the court as a matter of law, and a district court's interpretation is granted no deference. *WebBank v. Am. Gen. Annuity Serv. Corp.,* 2002 UT 88, ¶¶ 15, 19, 54 P.3d 1139.

¶ 57 While they acknowledge that the motion to dismiss should be treated like a

motion for summary judgment, the Grynbergs failed to move the court for a continuance or to file an affidavit pursuant to rule 56(f) of the Utah Rules of Civil Procedure. Thus, the Grynbergs' request to reverse summary judgment to allow discovery was not properly raised before the district court as a rule 56(f) motion, and we will not address the issue as such. *See Hebertson v. Willowcreek Plaza*, 923 P.2d 1389, 1391 n. 2 (Utah 1996); *Jackson v. Layton City*, 743 P.2d 1196, 1198 (Utah 1987). Furthermore, to the extent that the Grynbergs addressed the issue in their responsive briefs at trial, we agree with the district court that they "have failed to demonstrate how additional discovery would be of any assistance to their response to Defendants' motion." Simply asserting that more discovery is needed and that a proper response to the motion for summary judgment is impossible due to the other party's failure to cooperate with discovery requests is inadequate to overcome summary judgment. *Waddoups v. Amalgamated Sugar Co.*, 2002 UT 69, ¶ 36, 54 P.3d 1054. Parties must "offer more than conclusory assertions to demonstrate the existence of a genuine issue for trial," and cannot justify further discovery without providing a viable theory as to the nature of the facts they wish to obtain. *Id.; see also Jensen v. Redevelopment Agency*, 998 F.2d 1550, 1554 (10th Cir. 1993). We find that the district court did not abuse its discretion when it refused to postpone ruling on Questar's motion to dismiss.

¶ 58 The Grynbergs also argue that the district court improperly dismissed the third party beneficiary claims with prejudice after Questar failed to present evidence to support their motion for summary judgment on that issue and only challenged the sufficiency of the pleading. The district court found that the Grynbergs failed to submit facts that would support third party beneficiary status. In their appellate brief, the Grynbergs assert that they "provided the only evidence they need on this point, Questar's standard form agreement." They argue that the Hunt Contracts contain similar provisions, thus rendering the Grynbergs intended beneficiaries of the Hunt Contracts.

¶ 59 To prove third party beneficiary status in Wyoming, there is a two-part test.

*Richardson Assocs. v. Lincoln–Devore, Inc.*, 806 P.2d 790, 808 (Wyo.1991). First, a party must demonstrate standing to enforce the contract; specifically, "the right to performance must be 'appropriate to effectuate the intentions of the parties.'" *Id.* (internal citations omitted). Stated another way, an outsider to the contract must show that the promised performance was intended for his or her direct benefit. *Wyoming Mach. Co. v. United States Fid. & Guar. Co.*, 614 P.2d 716, 720 (Wyo.1980).

¶ 60 As proof of standing, the Grynbergs offer a sample gas gathering agreement. The agreement contains provisions that would require Questar to measure and analyze the gas volume and heat content for Hunt. In return, Hunt would promise to pay Questar for the gathering services. In the warranty of title clause, the agreement states that

> [Hunt] shall have the obligation to make settlements for all royalties due and payments owed to [Hunt's] mineral and royalty owners. [Hunt] agrees to indemnify [Questar] and save it harmless from all suits, actions, claims, debts, accounts, damages, costs, losses, liens, license fees, and expenses which arise from [Hunt's] obligations under this section.

¶ 61 This language does not support the argument that the parties to the contract intended to directly benefit mineral and royalty interest owners by granting them the right to enforce performance. There is nothing directly linking Questar's promise to measure and analyze with the interest owners' right to royalty payments from Hunt. The purpose of this contract was to empower Questar to gather gas from the wells operated by Hunt. The fact that the contract also recognizes that Hunt has separate and preexisting obligations to interest owners does not render it a contract intended to directly benefit those interest owners. To the extent that this contract assists Hunt in fulfilling its obligations to mineral and royalty owners, the contract provides an incidental benefit, and the mineral and royalty interest owners are only incidental, not intended, beneficiaries. *See Bear v. Volunteers of Am., Wyo., Inc.*, 964 P.2d 1245, 1252 (Wyo.1998); *Wyoming Mach. Co.*, 614 P.2d at 720. Since we

hold that the Grynbergs do not have standing to sue on the Hunt Contracts as intended third party beneficiaries, we need not address the second part of the test for third party beneficiary status in Wyoming.

### B. The Economic Loss Doctrine, Post–Hunt Contracts

¶ 62 The economic loss doctrine bars any tort claims that were barred before the Hunt Contracts. Wyoming does not require privity as a prerequisite to application of the economic loss doctrine, particularly when the parties are sophisticated businessmen involved in commercial dealings. *Rissler & McMurry Co. v. Sheridan Area Water Supply Joint Powers Bd.*, 929 P.2d 1228, 1235 (Wyo.1996) (The court held that contractor's tort claims against designer were barred under economic loss doctrine despite lack of a contract between the two; contractor had opportunity to allocate risks associated with the job in contract with the owner. "In deference to the abilities of sophisticated businessmen to provide contractual remedies in their business dealings, ... [a] contractor's claims against the architect must fail under the economic loss doctrine."); *see also Cooper Power Sys., Inc. v. Union Carbide Chem. & Plastics Co.*, 123 F.3d 675 (7th Cir.1997); *S.A.I., Inc. v. Gen. Elec. Railcar Servs. Corp.*, 935 F.Supp. 1150, 1154 (D.Kan. 1996) (holding privity of contract not required for application of the economic loss doctrine in Illinois). The Grynbergs had an opportunity to protect themselves when they contracted with Hunt to act on their behalf, and we assume that they did so in this case. The Grynbergs fail to provide any evidence that Questar breached any duty to them that exists independent of the contracts between themselves and their well operator, Hunt Oil, during this time period. *See supra* Part II.C.

### IV. COLORADO CONTRACT

¶ 63 The Grynbergs additionally allege that the district court improperly granted summary judgment to Questar on the Colorado Contract claim because the district court "rejected Questar's arguments that the Grynberg Parties failed to adequately plead fraud and therefore those allegations stand." The district court, applying the appropriate analysis for a summary judgment motion, held that the Grynbergs failed to raise a genuine issue of material fact regarding concealment or the enforceability of the 1992 general settlement and release.

¶ 64 The Colorado Contract claim is based upon straightforward take-or-pay breach of contract counterclaims raised in Questar II. The Colorado Contract counterclaims were dismissed without prejudice by the Questar II court on October 1, 1998, along with the BTU adjustment claims. There is no dispute that the Colorado Contract terminated January 1, 1992. The only issue raised before us is whether the general settlement and release signed February 11, 1992 was fraudulently obtained and should therefore be set aside. However, even if we allow the settlement and release to be set aside, the Grynbergs are still faced with insurmountable statute of limitations problems. As a contract for the sale of goods, the Colorado Contract is governed by the U.C.C. four-year statute of limitations and six-month savings statute. Thus, when the October 1, 1998 order dismissed the "219 Contract" claim without prejudice, the Grynbergs had only six months to refile that claim.[2] *See supra* Part II.A. This they failed to do.

### V. EQUITABLE TOLLING

¶ 65 Finally, we address the district court's failure to apply the equitable tolling doctrine to the BTU adjustment claims in this case. The Grynbergs assert that the district court should have tolled the statute of limitations for their BTU adjustment claims under the doctrine of equitable tolling, under which persons with several legal remedies who reasonably and in good faith pursue

---

2. We note the district court's order in Questar II, bifurcating the Colorado Contract claims, wherein the court states that "[t]o the extent the First Amended Counterclaim includes claims for relief that are premised upon Contracts No. 219 [the Colorado Contract] and 563, such allegations are vague and incomplete by their failure to particularly reference those contracts." It is with some generosity that we assume the Colorado Contract claim was previously asserted in Questar II and therefore even subject to a savings statute.

only one remedy should not suffer the statute of limitations. To the extent that Utah subscribes to the principle of equitable tolling, it has been developed almost exclusively through application of the discovery rule to claims that were not or could not have been discovered prior to the running of the statute of limitations. *Estes v. Tibbs*, 1999 UT 52, ¶ 7, 979 P.2d 823; *see also Sevy v. Sec. Title Co.*, 902 P.2d 629, 634–36 (Utah 1995). In *Estes*, the discovery rule was not at issue, but this court relied upon the language of prior discovery rule cases in holding that the statute of limitations would not be tolled for a plaintiff who had been imprisoned, lacking access to a lawyer or legal library. 1999 UT 52 at ¶ 5, 979 P.2d 823. The court stated that it would not be "truly 'irrational' or 'unjust'" to apply a statute of limitations" in that case. *Id.* at ¶ 9. Reserving equitable tolling for "more egregious circumstances," the court noted that "[c]ourts should be cautious in tolling a statute of limitations; liberal tolling could potentially cause greater hardships than it would ultimately relieve." *Id.* at ¶ 7.

¶ 66 The Grynbergs argue that it would not be fair to enforce the statute of limitations in this case for three reasons: (1) the BTU adjustment claims of Questar II were filed shortly after they were discovered and within the statute of limitations; (2) Questar has been on notice of their BTU claims since 1993 and would suffer no substantial prejudice if the claims were pursued now; and (3) the Grynbergs acted in good faith by filing this suit within one year of the Questar II dismissal. None of these reasons persuade us that this is a truly egregious circumstance, such that it would be irrational or unjust to enforce the statute of limitations. The Grynbergs have had ten years to develop claims that arise from contracts that were in effect from approximately 1974 to 1994. Statutes of limitation promote justice by discouraging plaintiffs from allowing claims to wither on the vine; the Grynbergs have had many years to fertilize the roots of their discovery, and have failed to provide any compelling reasons for allowing them another day in the sun.

## CONCLUSION

¶ 67 We reverse the district court's finding as to the preclusive effect of the partial summary judgment order from Questar III, and hold that a party is not collaterally estopped from arguing an issue settled in a partial summary judgment order from a separate case in another jurisdiction in which no final judgment has yet been entered. We remand to allow the district court to determine whether there are any valid contractual claims remaining. As to the rest of the arguments on appeal, we affirm. The contract claims from Questar II are governed by the six-month savings statute found in Utah Code Ann. section 70A–2–725(3) (2001), and are now barred by the statute of limitations; the economic loss doctrine bars all of the tort claims; and the Grynbergs are not intended third party beneficiaries of the Hunt Contracts. We affirm in part, reverse in part, and remand for proceedings consistent with this opinion.

¶ 68 Chief Justice DURHAM, Associate Chief Justice DURRANT, Justice RUSSON, and Judge BENCH concur in Justice WILKINS' opinion.

¶ 69 Justice HOWE did not participate herein; Court of Appeals Judge RUSSELL W. BENCH sat.