**YERINGTON FORD, INC., William Giles and Linda Giles, Plaintiffs,**

v.

**GENERAL MOTORS ACCEPTANCE CORPORATION, Defendant.**

No. CVN030147LRHVPC.

United States District Court, D. Nevada.

Dec. 15, 2004.

L. Bissonnette, Law Office of Michael P. Hambsch, South Lake Tahoe, NV, William Wheeler, William Wheeler & Associates, PC, Philadelphia, PA, for Plaintiffs.

Christopher Jaime, Michael Malloy, Walther Key Maupin, et al., Reno, NV, for Defendant.

## *ORDER*

HICKS, District Judge.

The Court presently has the following motions before it: (1) Defendant's Motion for Leave to File Dispositive Motion Based on Post–Cutoff Events and Motion for Summary Judgment on Counts 1–12 (Docket No. 100). Plaintiffs have filed a Response (Docket No. 103), to which Defendants have replied (Docket No. 109).(2) Defendant's Motion for Summary Judgment on Counts 3–13 (Docket No. 78). Plaintiffs have filed an Opposition (Docket No. 107), to which Defendants have replied (Docket No. 114).(3) Defendant's Motion for Summary Judgment on Counts 1 and 2 (Docket No. 79), with the accompanying Opposition (Docket No. 95) and Reply (Docket No. 96).(4) Defendant's Consolidated Motions in Limine (Docket No. 81) with numerous responsive pleadings. This

Court has jurisdiction pursuant to 28 U.S.C. § 1332, based on the diversity of the parties and the amount in controversy. Each motion for summary judgment is brought pursuant to Rule 56 of the Federal Rules of Civil Procedure. This Court will address each motion in turn.

## I. FACTUAL AND PROCEDURAL BACKGROUND

The facts surrounding this case are largely in dispute. In considering Defendant's motion for summary judgment, this Court will view the facts in the light most favorable to the non-moving party. *Rose v. Wells Fargo & Co.*, 902 F.2d 1417, 1420 (9th Cir.1990). Therefore, this Court assumes, without finding, the truth of those facts alleged by Plaintiffs which are supported by the record. *Reese v. Jefferson School Dist. No. 14J*, 208 F.3d 736 (9th Cir.2000); *Doe v. Tenet*, 329 F.3d 1135, 1138 (9th Cir.2003).

Plaintiffs William ("Giles") and Linda Giles (collectively "the Giles") are the officers and sole shareholders of plaintiff Yerington Ford, a dealership selling new and used vehicles in Yerington, Nevada, under a franchise agreement with Ford Motor Company. In 1998, Yerington Ford and Defendant General Motors Acceptance Corporation ("GMAC") entered into a "wholesale floorplan financing" agreement, which allowed Yerington Ford to purchase and display new and used vehicles for sale, and then to repay GMAC, with interest, after the vehicles were sold.

The events giving rise to this lawsuit commenced on October 10, 2001, when GMAC conducted a "floorplan audit" revealing that Yerington Ford had sold eleven vehicles "out of trust." (Am. Compl.(# 25) at ¶¶ 9, 32; Mot. Summ. J. (# 100) at ¶¶ 3–4.) An "out of trust" sale occurs when the dealership sells a financed vehicle without paying the lender as required by the floorplan agreement. (Mot.

Summ. J. (# 100) at ¶ 3.) On the following day, Jeffrey Sanders, an Operations Manager employed by GMAC, allegedly informed Plaintiffs that GMAC would padlock the door to the dealership if the Giles did not sign a document assigning vehicle sales proceeds to GMAC. (Pls.' Resp. to Mot. Summ. J. (# 96) Ex. A.) The assignment, dated October 11, 2001, makes no explicit assignment, however, of any rights regarding an "open account" containing funds that Ford Motor Company paid to Yerington Ford under various factory credit programs. After the signing of this assignment, GMAC began receiving from Ford Motor Company the open account money earned by Yerington Ford and continued to do so for most months until the dealership closed in May 2003. (Pls.' Resp. to Mot. Summ. J.(# 96) Exs. A & B.)

The Giles also executed a deed of trust placing a 4.3 million dollar lien on property owned by the Giles, again allegedly under threat of GMAC padlocking the door of Yerington Ford. (Pls.' Resp. to Mot. Summ. J.(# 96) Ex. 25.) According to the Giles, they had been informed that the deed of trust would only be for the amount of the "out of trust" sales, which amounted to close to $300,000, and that the deed of trust would be released once that amount was paid. (Pls.' Resp. to Mot. Summ. J. (# 96) Ex. A.) As a result of Snyder's warning that GMAC would shut down Yerington Ford, the Giles also signed a forbearance agreement, apparently with the understanding that the floorplan agreement would be fully reinstated once Yerington Ford paid GMAC the amount owed for the sale of its vehicles "out of trust." (Pls.' Resp. to Mot. Summ. J.(# 96) Ex. 23.) The "out of trust" amount was paid to GMAC by October 23, 2001. (Pls.' Resp. to Mot. Summ. J.(# 96).)

On March 12, 2002, GMAC agent Douglas Snyder visited the dealership and de-

manded that Plaintiffs sign two documents: (1) a Joint Notice of Assignment and Demand for Payment and (2) an Assignment of Accounts Due or to Become Due. (Pls.' Resp. to Mot. Summ. J.(# 96) Ex. 20.) Snyder represented that these documents were part of the standard wholesale floorplan agreement which should have been executed on April 24, 2001 when all the other dealers floor planned by GMAC executed the same documents. The Giles were asked to backdate the Assignment of Accounts Due or to Become Due to April 24, 2001. (*Id.*) These assignments gave GMAC the authority to collect the monies from the open account directly from Ford Motor Company.

This action was commenced on March 19, 2003 when Plaintiffs filed a complaint (Docket No. 2), which Plaintiffs later amended (Docket No. 25). The Amended Complaint contains 13 separate counts based on claims for contract and tort violations, including claims for breach of fiduciary duty, constructive fraud, fraud, negligent misrepresentation, conversion, and undue influence. After the Amended Complaint had been filed, the Court became aware of a conflict of interest between the Giles and Yerington Ford. As a result of that conflict, Plaintiffs agreed to the dismissal with prejudice of all of Plaintiffs' breach of contract claims and of Defendant's corresponding counter-claims. (Docket No. 92.) As a result, only Plaintiffs' tort claims remain.

## II. LEGAL STANDARD

### A. OPERATIVE LAW

A federal district court, sitting in diversity, must apply the substantive law of the forum state in which it resides. *Erie R. Co. v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). *See also Fortis Benefits Ins. Co. v. Johnson*, 966 F.Supp. 987, 989 (D.Nev.1997). Accordingly, the Court will apply Nevada law in order to adjudicate the instant case.

### B. SUMMARY JUDGMENT

Summary judgment is appropriate only when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). In assessing a motion for summary judgment, the evidence, together with all inferences that can reasonably be drawn therefrom must be read in the light most favorable to the party opposing the motion. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *County of Tuolumne v. Sonora Cmty. Hosp.*, 236 F.3d 1148, 1154 (9th Cir.2001).

The moving party bears the burden of informing the court of the basis for its motion, along with evidence showing the absence of any genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). On those issues for which it bears the burden of proof, the moving party must make a showing that is " 'sufficient for the court to hold that no reasonable trier of fact could find other than for the moving party.' " *Calderone v. United States*, 799 F.2d 254, 259 (6th Cir.1986). *See also Idema v. Dreamworks, Inc.*, 162 F.Supp.2d 1129, 1141 (C.D.Cal.2001). For those issues where the moving party will not have the burden of proof at trial, the movant must point out to the court "that there is an absence of evidence to support the nonmoving party's case." *Catrett*, 477 U.S. at 325, 106 S.Ct. 2548.

In order to successfully rebut a motion for summary judgment, the non-moving party must point to facts supported by the

record which demonstrate a genuine issue of material fact. *Reese v. Jefferson School Dist. No. 14J,* 208 F.3d 736 (9th Cir.2000). A "material fact" is a fact "that might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) Where reasonable minds could differ on the material facts at issue, summary judgment is not appropriate. *See v. Durang,* 711 F.2d 141, 143 (9th Cir.1983). A dispute regarding a material fact is considered genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Liberty Lobby,* 477 U.S. at 248, 106 S.Ct. 2505, 91 L.Ed.2d 202. The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient to establish a genuine dispute; there must be evidence on which the jury could reasonably find for the plaintiff. *See id.* at 252, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202.

### III. MOTION FOR SUMMARY JUDGMENT ON COUNTS 1–12: THE ECONOMIC LOSS DOCTRINE

With the dismissal of Plaintiffs' breach of contract claims, only the intentional and/or negligent tort and fraud claims remain. Defendant argues that all these claims should be dismissed as a matter of law, based on the economic loss doctrine.[1] Defendant's argument is based on Nevada's adoption of the economic loss doctrine (or economic loss rule).

Defendant argues that the economic loss doctrine should be applied to bar both negligent and intentional tort and/or fraud claims where those claims are "intertwined with, and therefore not extraneous to or independent of, a contract or contractual performance." (Def.'s Mot. Summ. J. (# 100) at 4.) Before considering whether Plaintiffs' intentional tort and fraud claims should be barred by the economic loss doctrine, it is noted that Plaintiffs concede that Counts Four through Ten of the Amended Complaint are barred by the economic loss doctrine because the duty breached in those counts is the same duty that is imposed by the floorplan agreement. In other words, Plaintiffs concede that the torts alleged in those counts were not independent of the contractual obligations imposed by the parties. Therefore, Counts Four, Five, Six, Seven, Eight, Nine, and Ten of their Amended Complaint will be dismissed. In this Motion for Summary Judgment, the claims that remain in dispute are Counts One, Two, Three, Eleven, and Twelve.

Defendant argues that Plaintiffs' concession regarding Counts Four through Ten is evidence that Plaintiffs accept and agree with Defendant's legal analysis with regard to the economic loss doctrine. Accordingly, Defendant argues that Plaintiff agrees that both negligence *and* intentional torts that are not independent of a contract are barred by the economic loss doctrine. Although it is unclear to what extent, if any, Plaintiffs disagree with Defendant's legal analysis of the economic loss doctrine, the Court will not assume that they are in accord with the whole of Defendant's legal reasoning.

The question of whether the economic loss doctrine bars intentional tort and fraud claims that are not independent of contractual claims appears to be one of

---

1. Such a dismissal would have the effect of doing away with the first twelve of the thirteen counts present in the amended complaint. In this Motion for Summary Judgment, the Defendant does not attack Plaintiffs' thirteenth count, the Giles' individual claim for emotional distress, but focuses on the claims brought by Yerington Ford. Consequently, in this section of its Order (Counts 1–12: The Economic Loss Doctrine), the Court will focus on Yerington Ford's claims. The Giles individual claims will be discussed in the next section dealing with breach of fiduciary duty.

first impression for the Nevada Supreme Court. In the absence of controlling precedent from the Nevada Supreme Court, this Court must use its own best judgement to predict how the state court would decide the relevant substantive issues. *Dimidowich v. Bell & Howell,* 803 F.2d 1473, 1482 (9th Cir.1986), *reh'g denied, modified,* 810 F.2d 1517 (9th Cir.1987); *Takahashi v. Loomis Armored Car Service,* 625 F.2d 314, 316 (9th Cir.1980); *Associated Aviation Underwriters, Inc. v. Vegas Jet, L.L.C.,* 106 F.Supp.2d 1051, 1053 (D.Nev.2000). "In doing so, this Court may look to state court decisions from sister jurisdictions, treatises and other helpful resources." *Vegas Jet,* 106 F.Supp.2d at 1053.

## A. ECONOMIC LOSS DOCTRINE

■ The Nevada Supreme Court clarified Nevada's economic loss doctrine in *Calloway v. City of Reno,* a case in which the economic loss doctrine was applied to claims arising from alleged construction defects. 116 Nev. 250, 993 P.2d 1259 (2000). In that case, the court stated that "[t]he economic loss doctrine marks the fundamental boundary between contract law, which is designed to enforce the expectancy interests of the parties, and tort law, which imposes a duty of reasonable care and thereby encourages citizens to avoid causing physical harm to others." *Id.* at 1263. Central to the doctrine is the "premise that economic interests are protected, if at all, by contract principles, rather than tort principles." *Id.* at 1265. Generally, "the economic loss doctrine prohibits recovery in tort for purely economic losses." *Id.* at 1263. Purely economic loss is defined as "the loss of the benefit of the user's bargain ... including ... pecuniary damage for inadequate value, the cost of repair and replacement of the defective product, or consequent loss of profits, without any claim of personal injury or damage to other property." *Id.* at 1263

(quoting *American Law of Products Liability* § 60:39, at 66 (3d ed.1991)). The economic loss doctrine "shield[s] a defendant from unlimited liability for all of the economic consequences of a negligent act, particularly in a commercial or professional setting, and thus ... keep[s] the risk of liability reasonably calculable." *Id.* at 1266 (quoting *Local Joint Executive Board v. Stern,* 98 Nev. 409, 651 P.2d 637, 638 (1982)). It also encourages the parties to negotiate economic risks through contractual provisions and price terms prior to contract formation, thus avoiding the cost burden on the public that results from the imposition of a tort duty. *Florida Power & Light Co. v. Westinghouse Electric Corp.,* 510 So.2d 899, 901–02 (1987). Although the doctrine arose in the area of products liability, it has since gained broader application and serves to maintain the distinction between contract and tort principles. *Id.* at 1265.

■ The Nevada Supreme Court has applied the economic loss doctrine to bar claims of negligence and strict liability where the loss was purely economic in nature. *See Calloway,* 116 Nev. 250, 993 P.2d 1259. Among other things, the court has applied the doctrine to claims of construction defects, *see Calloway,* 116 Nev. 250, 993 P.2d 1259, and to claims for lost wages and employment benefits, *see Local Joint Executive Board v. Stern,* 98 Nev. 409, 651 P.2d 637 (1982), but Nevada has not applied the economic loss doctrine to creditor/debtor contracts. Still, the Nevada Supreme Court has not attempted to limit its application of the economic loss doctrine to any particular type of case. In fact, in *Calloway,* responding to the dissent's desire to create an exception for construction defects, the majority responded that any attempt to exempt a certain type of case from the doctrine would undermine the very purpose of the economic

loss doctrine: to provide a boundary between contract and tort law. *Calloway*, 993 P.2d at 1266 n. 3.[2] Therefore, the Court predicts that the Nevada Supreme Court would apply the economic loss doctrine to creditor/debtor contracts.

As a threshold matter, Defendant argues, and Plaintiffs apparently agree, that Plaintiffs' damages in counts one through twelve are purely economic in nature, that is, that none of Plaintiffs' claims are based on personal injury or damage to property.[3] The Court agrees that the damages sought by Yerington Ford are purely economic in nature.

Both parties acknowledge that Nevada's economic loss doctrine bars claims of negligence and strict liability arising out of contract. Defendant correctly states that the Nevada Supreme Court has not dealt with whether the economic loss doctrine bars intentional and/or negligent tort and fraud claims that are interwoven with a contract or contractual duties. Defendant further alleges that if it were faced with the issue, the Nevada Supreme Court would hold that all tort and fraud claims seeking to recover solely economic damages are barred by the economic loss rule when they are not independent of a contract. In support of its argument, Defendant points to numerous cases from multiple jurisdictions in which the state courts have adopted, or in which the federal court has predicted that the state supreme court would adopt, a form of the economic loss doctrine barring intentional tort and fraud claims interwoven with a contract, with only limited exceptions.[4] Accordingly, Defendant argues that any tort claim based on purely economic loss that is not truly

**2.** In *Olson v. Richard*, the Nevada Supreme Court later ruled that the Legislature modified the holding of *Olson*, 120 Nev. 240, 89 P.3d 31 (Nev.2004). In *Olson*, the court held that the economic loss doctrine did not bar a *statutory* construction defect action brought under Nev.Rev.Stat. 40.635 and 40.640.

**3.** Although Plaintiffs do not explicitly state that their claims are purely economic in nature, they do admit that the economic loss rule (which applies only to purely economic claims) does bar many of their claims for relief. Furthermore, Plaintiffs have adduced no evidence that Yerington Ford has suffered damages to person or property.

**4.** *See, e.g., Werwinski v. Ford Motor Company,* 286 F.3d 661, 678 (3rd Cir.2002) (holding that the state of Pennsylvania would not adopt an exception to the economic loss doctrine for intentional fraud claims); *Marvin Lumber & Cedar Co. v. PPG Indus., Inc.,* 223 F.3d 873, 885 (8th Cir.2000) (applying Minnesota law to hold economic loss rule bars fraud claims when not independent of a contract); *Dinsmore Instrument Co. v. Bombardier, Inc.,* 199 F.3d 318 (6th Cir.1999) (applying Michigan law to hold economic loss doctrine precluded tort recovery where fraud claims were not extraneous to contractual dispute); *AKA Dis-tributing Co. v. Whirlpool Corp.,* 137 F.3d 1083, 1086–87 (8th Cir.1998) (applying Minnesota law to hold fraud claim barred and noting fraud claim independent of a contract is actionable, but it must be based upon a misrepresentation outside of, or collateral to, a contract); *Cooper Power Systems v. Union Carbide,* 123 F.3d 675, 682 (7th Cir.1997) (holding, under Wisconsin law, misrepresentation claims barred by economic loss rule where they related to quality of product sold under contract); *Hoseline Inc. v. U.S.A. Diversified Prods., Inc.,* 40 F.3d 1198, 1200 (11th Cir.1994) (economic loss doctrine bars tort recovery for contract claims which involve no injury to persons or property); *Reilly Foam Corp. v. Rubbermaid Corp.,* 206 F.Supp.2d 643, 658–59 (E.D.Pa.2002); *Serina v. Albertson's, Inc.,* 744 F.Supp. 1113 (M.D.Fla.1990) (deciding that economic loss rule bars recovery for intentional tort interwoven with breach of contract claim); *Digicorp, Inc. v. Ameritech Corp.,* 262 Wis.2d 32, 662 N.W.2d 652, 653 (2003) (holding that the economic loss doctrine creates an exception for fraud only where it is independent of the contract); *HTP, Ltd. v. Lineas Aereas Costarricenses, S.A.,* 685 So.2d 1238, 1239–40 (Fla.1996) (same); *Huron Tool & Eng'g Co. v. Precision Consulting Servs., Inc.,* 209 Mich.App. 365, 532 N.W.2d 541, 545 (1995) (same).

independent of a contract should be barred by the economic loss doctrine.

■ Plaintiffs have provided no argument as to why the Nevada Supreme Court would not adopt a position holding that the economic loss doctrine bars all tort claims that are interwoven with the claim that arise from a contractual breach. The Court finds the cases cited by Defendant to be persuasive on this issue. *See* footnote 4. In particular, the Court finds the reasoning of Utah Supreme Court in *Grynberg v. Questar Pipeline Co.*, 70 P.3d 1 (Utah 2003) to be especially helpful. In that case, the Grynbergs, who were owners of working interests in natural gas wells brought claims against a gas purchaser for breach of contract, negligent or intentional misrepresentation, fraud, conversion, negligence, and breach of fiduciary duty, almost mirroring the claims brought in this case. In that case, the court, interpreting Wyoming law, decided that all the tort claims brought by the Grynbergs were barred by the economic loss doctrine. In making its decision, the court reasoned:

> The effect of confusing the concept of contractual duties, which are voluntarily bargained for, with the concept of tort duties, which are largely imposed by law, would be to nullify a substantial part of what the parties expressly bargained for-limited liability.... No reason appears to support such a radical shift from bargained-for duties and liabilities that were expressly negated by the parties themselves when they decided to abandon their status as legal strangers and define their relationship by contract.

*Id.* at 12 (quoting *Snyder v. Lovercheck*, 992 P.2d 1079, 1087 (Wyo.1999)). The court further noted that "when parties' difficulties arise directly from a contractual relationship, the resulting litigation concerning those difficulties is one in contract no matter what words the plaintiff may wish to use in describing it." *Id.* at 12 (quoting *Snyder*, 992 P.2d at 1088). Such language seems to mirror that already given in *Calloway*: "The crux of the [economic loss] doctrine is ... the premise that economic interests are protected, if at all, by contract principles, rather than tort principles." 993 P.2d at 1265. Based on the Nevada Supreme Court's pronouncements on the purpose of the economic loss doctrine, combined with the other cited authorities on the subject, the Court predicts that the Nevada Supreme Court would find that the economic loss doctrine bars intentional and fraudulent tort claims that are interwoven with contractual claims.

## B. INDEPENDENCE

■ Ostensibly, Plaintiffs do not dispute that tort claims that are interwoven with contract claims should be barred by the economic loss doctrine. Instead, they argue that their tort claims are independent from their breach of contract claims and that the economic loss doctrine does not bar tort claims that are independent of contract claims. In deciding whether claims that are independent of contract claims are exempt from the economic loss doctrine, the Court looks to state substantive law. *See Erie Railroad v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938); *see also Fortis Benefits Ins. Co. v. Johnson*, 966 F.Supp. 987, 989 (D.Nev. 1997). In *Calloway*, the Nevada Supreme Court quoted language from *Bernard v. Rockhill Development Company*, an earlier case dealing with the distinction between tort and fraud claims:

> A breach of contract may be said to be a material failure of performance of a *duty arising under or imposed by agreement.* A tort, on the other hand, is a violation of a duty imposed by law, *a wrong independent of contract.* Torts can, of

course, be committed by parties to a contract. The question to be determined ... is whether the actions or omissions complained of constitute a violation of duties imposed by law, or of duties arising by virtue of the alleged express agreement between the parties. *Calloway*, 993 P.2d at 1263 (quoting *Bernard v. Rockhill Dev. Co.*, 103 Nev. 132, 734 P.2d 1238, 1240 (1987)) (emphasis added). In other words, if a duty to perform is imposed by contract, then the violation of that same duty cannot also be the basis of a tort claim. Therefore, a tort claim is only viable where the duty alleged to have been violated is independent of, or not arising out of, a duty imposed by the contract. This understanding of *Calloway* is bolstered by case law from neighboring jurisdictions. For example, in *Grynberg*, a case Defendant cites at length, the Utah Supreme Court stated that "the economic loss rule does not bar tort claims when those tort claims *are based on a duty independent of those found in the contract.*" 70 P.3d 1, 13 (Utah 2003) (interpreting Wyoming law). The court further noted that "once there is a contract, any tort claim must be premised upon an independent duty that exists apart from the contract." *Id.* at 11. *See also Town of Alma v. Azco Const., Inc.*, 10 P.3d 1256, 1264 (Colo.2000) (stating that, under the economic loss doctrine, a party may not bring an action in tort for breach of contract absent an independent duty of care under tort law); *HTP, Ltd. v. Lineas Aereas Costarricenses, S.A.*, 685 So.2d 1238, 1239 (Fla.1996) (holding that the economic loss rule has not eliminated causes of action based upon torts independent of the contractual breach). Therefore, the Court finds that the economic loss doctrine does not bar tort claims that are based on a duty independent of those imposed by the contract.

■ The tort of fraudulent inducement is the most salient example of an indepen-

dent tort that is not barred by the economic loss doctrine. The current trend among jurisdictions that have adopted the economic loss doctrine appears to be to adopt an exception to the economic loss doctrine for fraud claims that are independent of contractual duties, i.e., where the fraud occurred prior to the formation of the contract rather than in the performance of the contractual provisions. *See, e.g., Digicorp, Inc. v. Ameritech Corp.*, 262 Wis.2d 32, 662 N.W.2d 652, 653 (2003) (holding that exception for fraud only where independent of the contract); *HTP, Ltd. v. Lineas Aereas Costarricenses, S.A.*, 685 So.2d 1238, 1239–40 (Fla.1996) (same); *Huron Tool & Eng'g Co. v. Precision Consulting Servs., Inc.*, 209 Mich.App. 365, 532 N.W.2d 541, 545 (1995) (same). In other words, a claim for fraud in the inducement would be independent of the contract while a claim for fraud in the performance of the contract would not. The *Huron Tool* case gives an explanation of why fraud claims that occur prior to the formation of a contract should be granted an exception to the economic loss doctrine:

> Fraud in the inducement presents a special situation where parties to a contract appear to negotiate freely-which normally would constitute grounds for invoking the economic loss doctrine-but where in fact the ability of one party to negotiate fair terms and make an informed decision is undermined by the other party's fraudulent behavior.

532 N.W.2d at 545. The distinction drawn between fraud in the inducement and fraud in the performance, therefore, is "the same as the distinction ... between fraud extraneous to the contract and fraud interwoven with the breach of contract." *HTP*, 685 So.2d at 1239. Fraud in the performance does not give rise to an independent cause of action in tort whereas fraud in the inducement does. *Id.* at 1239.

As the Court predicts that the Nevada Supreme Court would bar tort claims for

purely economic loss where those claims are interwoven with contract claims or duties, the Court must determine if the tort claims brought by Plaintiffs are independent of their contract claims. *See Bernard*, 734 P.2d at 1240. Plaintiffs claim that their tort claims are independent of their contract claims because those claims "arose as a result of the [Defendant] violating a duty imposed by law. [They are] separate and distinguished from the contract and/or breach of contract claims." (Pls.' Resp. Mot. Summ. J. (# 106) at 2.) However, even when the facts of this case are taken in the light most favorable to the Plaintiffs, *County of Tuolumne v. Sonora Cmty. Hosp.*, 236 F.3d 1148, 1154 (9th Cir.2001), this Court is unpersuaded that the tort claims are independent of the contract claims.

The fact that Plaintiffs' claims are based on duties imposed by law is not sufficient to make a claim independent of a contract claim. As the Nevada Supreme Court stated, in language quoted by Plaintiffs, "[a] tort . . . is . . . a wrong *independent of contract*." *Calloway*, 993 P.2d at 1263. As the court has already noted, for a tort claim to be viable in this case, it must be based on a *duty* independent of a *duty* imposed by the contract. *See Grynberg*, 70 P.3d at 13. If the duties Defendant allegedly violated arose out of the floorplan agreement, a cause of action will not lie in tort for a breach of those same duties.

Each claim brought by Plaintiff arises out of, and directly depends upon Plaintiffs' contractual relationship with Defendant GMAC. In 1998, Yerington Ford and Defendant entered into a "wholesale floorplan financing" agreement, and the resulting dispute between the parties has arisen as a result of that contract. As part of that agreement, Defendant acquired a security interest in every vehicle it financed, which would apparently include virtually every vehicle sold by Yerington Ford. Plaintiffs admit that they sold vehicles "out of trust," which, the Court notes, Giles has apparently admitted amounted to a breach of the wholesale floorplan financing agreement. (*See* Def.'s Mot. Summ J. (# 100) at 5.) At that point, with Yerington Ford owing Defendant nearly three hundred thousand dollars, Defendant had the right, under the floorplan agreement, to take possession of every car in which it had a security interest. (*See* Wholesale Security Agreement.) In lieu of executing this extreme contractual remedy, Defendant and Plaintiffs apparently entered into a series of supplemental agreements whereby Yerington Ford would be able to continue selling vehicles, albeit with more restrictions than under the original agreement. Every claim made by Plaintiffs deal with the formation of those supplemental agreements, which were only formed because of, and arising out of Plaintiffs' material breach of the original floorplan agreement. In other words, unlike a claim of fraud in the inducement, which occurs prior to the formation of contract, the torts alleged by Plaintiffs occurred as a result of protections insisted upon by GMAC in the place of extreme remedies available through the preexistent floorplan agreement.

In *Keys Jeep Eagle, Inc. v. Chrysler Corp.*, a case strikingly similar to this one, the United States District Court for the Southern District of Florida held that Plaintiffs claims for fraud and for breach of fiduciary duty were barred by the economic loss doctrine. 897 F.Supp. 1437 (S.D.Fla.1995). There, as here, plaintiff, an automobile dealership, had entered into a floorplan agreement with a creditor, Chrysler Credit Corporation ("CCC"). The dealership sold vehicles out of trust, and CCC imposed restrictions on the dealerships' future sales, just as in this case. After the dealership failed, it brought claims for fraud and breach of fiduciary duty based on the actions of CCC after the

dealership had sold its vehicles out of trust. The court, finding that the claims were barred by the economic loss doctrine, noted that "each allegation relates to, arises out of, or directly depends upon Plaintiffs' contractual relationship with CCC" and that "all of the fraud allegations are wholly dependent on the contractual relationship." *Id.* at 1443. The Court finds that the same is true in this case.

Although not cited by either party, the Court takes note of the case of *Bernard v. Rockhill Dev. Co.*, 103 Nev. 132, 734 P.2d 1238 (1987). In that case, the Nevada Supreme Court held that the defendant had a separate duty, independent of that imposed by contract, not to fraudulently misrepresent its intention to perform and that a separate cause of action could be brought for misrepresentation. *Id.* at 1240. However, that case is distinguishable from the current action. In *Bernard,* the defendant and the plaintiffs had entered into an agreement whereby the plaintiffs would purchase a lot and defendant would build a residence on that lot. *Id.* at 1239. Later, the defendant asked the plaintiffs to "unrecord" the contract of sale and thereby release any lien or encumbrance on the title to the lot, so that the defendant could obtain sufficient construction money. *Id.* at 1240. The plaintiffs complied with his request, but the defendant failed to construct the home as he had agreed. *Id.* The court noted that, in "unrecording" their contract of sale, plaintiffs gave up a valuable legal right, but defendant gave up nothing. *Id.* Indeed, the defendant, by virtue of his misrepresentation, had gained something to which he had no entitlement. Unlike *Ber-*

*nard,* this case is not about misrepresentation of intent to perform, which is more akin to fraud in the inducement than fraud in the performance. In *Bernard,* it appears that the Nevada Supreme Court was concerned with a wrongdoer profiting from his misconduct whereas, in this case, the Court, based on the evidence before it, is unable to conclude that GMAC ever received more than it was owed under the original contract. Furthermore, GMAC has not received "something for nothing," as was the situation in *Bernard;* instead, Yerington Ford was able to continue operations because of the subsequent agreements. Therefore, *Bernard* is inapplicable to the present action.

As a result, Plaintiffs' remaining claims for misrepresentation, breach of fiduciary duty, undue influence, constructive fraud, fraud, and conversion will be dismissed. Counts 1–12 of the Amended Complaint will be dismissed.

## IV. MOTION FOR SUMMARY JUDGMENT ON COUNTS 3–13: BREACH OF FIDUCIARY DUTY

■ The Court has previously reasoned that all of Plaintiff Yerington Ford's tort claims against Defendant GMAC should be dismissed because of the economic loss doctrine. As a result, Counts 1–11 and 13 of the Amended Complaint have been disposed of. Only Count 12, the Giles' individual claim for emotional distress, remains. Defendant's Motion for Summary Judgment, Counts 3–13, attacks the viability of the Giles' individual claim for emotional distress on the grounds that the Giles did not have a confidential and/or fiduciary relationship with GMAC.[5] As the

---

**5.** The Court has previously noted that Plaintiffs' claim for emotional distress is based solely on the the allegation that GMAC breached its fiduciary and/or confidential relationship with the Giles. (Order (# 39), at 10 n. 4.)

Because the Court has found that Yerington Ford's claims for breach of fiduciary duty are barred by the economic loss doctrine, it is not necessary to decide whether a fiduciary-type relationship existed between GMAC and Yerington Ford (as opposed to between GMAC

Giles' claim for emotional distress is predicated on the existence of a confidential and/or fiduciary relationship between the Giles and GMAC, the lack of the existence of such a relationship would doom the emotional distress claim, as well. Defendant argues that no reasonable jury could find that a special relationship existed between GMAC and the Giles.

## A. FACTS BEARING ON THE RELATIONSHIP BETWEEN THE PARTIES

Giles' experience in the automobile sales industry began in September of 1974 when he began employment at Winter Chevrolet in Pittsburgh, California. (Def.'s Mot. Summ. J. (# 78) at 3.) In March, 1985, Giles became the General Sales Manager at Winter Chevrolet. *(Id.)* He was in charge of both new and used cars, overseeing the sales crew, closing deals, and getting cars financed, conducting sales meetings, ordering cars, appraising used cars, going to auctions, purchasing wholesale cars, setting up pay plans and bonus plans, and managing inventory. *(Id.)* However, he did not deal with floorplan financing. (Dep. of William Giles, 49:4–12.) In February, 1988, Giles spent a week in Detroit, Michigan at a dealer school sponsored by GM that provided training on becoming a general manager. *(Id.* at 45:16–46:9.) Giles has also earned an Associates Arts Degree. *(Id.* at 45:2–9.)

In February, 1991, Giles left Winter Chevrolet to start his own dealership in Yerington, Nevada. (Def.'s Mot. Summ. J. (# 96) at 3). Through his legal counsel, Giles created Bill Giles Motor Company, Inc.("BGMC") in order to apply for a Chevrolet franchise. *Id.* Giles is the sole owner of BGMC. *Id.* The first GMAC representative with whom Giles dealt was Jeff

Harper, then Branch Manager for GMAC overseeing floorplan financing for dealers in the area. *Id.* In the process of signing forms for the dealership, Giles described his conversation with Harper as follows: "And we discussed ... this is like a marriage. What works for the one works for the other, and one takes care of the other." (Dep. of William Giles, 145:25–146:3.) Giles has made no claim of being good friends with Harper. Again, according to Giles, "we looked out for each other's interest, because they make money from doing business with me." (Dep. of William Giles, 147:3–5.)

On February 26, 1992, BGMC and GMAC entered into a "GMAC Lease Plan Dealer Agreement." (Def.'s Mot. Summ. J. (# 78) at 4.) Paragraph VII.A of that agreement provides:

> Dealer is Not Made Agent or Representative of GMAC—This Agreement does not make either party the agent or legal representative of the other for any purpose whatsoever, nor does it grant either party any authority to assume or to create any obligation on behalf or in the name of the other. Neither party owes the other any fiduciary obligation.

(Def.'s Mot. Summ. J. (# 78) at 4.) On September 5, 1997, Giles signed another "GMAC Lease Plan Dealer Agreement" on behalf of BGMC. That document contains the same language as that quoted above. (Def.'s Mot. Summ. J. (# 78) at 4.)

In 1997, Doug Snyder took over for Jeff Harper as GMAC representative overseeing the floorplan financing of BGMC. Giles states that Snyder was a "personal friend," and he came to dinner and a few other functions in Yerington with the Giles, "as a friend." (Dep. of William Giles, 152:5–7.)

and the Giles). However, the Court has decided to address the issue both as part of its analysis of the Giles' individual claim for

emotional distress and as an alternative basis for its holding.

In July of 1997, Plaintiff Yerington Ford entered into an agreement to purchase a Ford dealership. (Def.'s Mot. Summ. J. (# 78) at 4–5.) When Yerington Ford purchased the Ford dealership, the floorplan financing in place was through Ford Motor Credit Company. (*Id.* at 5.) According to Giles, GMAC extends credit based on car count, but Ford Motor Credit Company extends credit based on dollar amount. Also, cars purchased at auction and factory sales went against Yerington Ford's new flooring credit with Ford Motor Credit Company, which Giles did not like. (Dep. of William Giles, 154:12–156:1.) Giles explained why Yerington Ford switched to GMAC as follows:

Q. Why did you switch to GMAC?

A. A couple of reasons. Number one, Doug [Snyder] was a good friend and I had a real good relationship with him and it would be a feather in his cap pulling a Ford store over to GMAC. I liked the way they counted cars, not dollar amounts, because 10 power-stroke diesel trucks use up almost 350,-$400,000 in flooring and then a few other vehicles. It restricted what I wanted to do in new and used car sales.

Q. You think that Ford's scheme was— prevented you from selling as many cars, is that basically it?

A. Yes.

Q. You wanted to go with GMAC because you thought you could make more money; is that a fair statement?

A. Correct.

Q. That is ultimately why you are in business, isn't it, to make money?

A. Correct.

Q. You wanted to be with GMAC primarily for that reason; is that a fair statement?

A. Yes.

(*Id.* at 156:22–157:21.) At another point, Giles stated that he tried to do as much business with GMAC as possible because he considered them a partner. (Dep. of William Giles, 190:25–191:1.)

On September 5, 1997, Yerington Ford entered into a Retail Agreement with GMAC. (Def.'s Mot. Summ. J. (# 78) at 6.) Similar to the Lease Plan Agreements between BGMC and GMAC, the agreement states that "Neither party owes the other any fiduciary obligation." (*Id.*) Giles has testified that he never read any of these documents. (Dep. of William Giles, 167:25–168:1.) Giles believes that Yerington Ford is in a fiduciary relationship with GMAC, (*Id.* at 165:6–168:25,) and that they were in a "business partnership." (*Id.* at 191:12–16.)

With regard to Mr. and Mrs. Giles personally, Giles believes that they are in a fiduciary relationship with GMAC because the Giles "have personally guaranteed everything" and because of the friendship he developed with Doug Snyder. (*Id.* at 192:7–24.)

## B. RELATIONSHIP BETWEEN GMAC AND YERINGTON FORD

Defendant argues that, generally, no fiduciary relationship arises from a lender-debtor relationship, and that the facts in this case, even when viewed in the light most favorable to Plaintiffs, do not create a situation in which GMAC owed a special duty of care to either Yerington Ford or to the Giles personally. In response, Plaintiffs rely on the facts already cited by the Court, and they argue that GMAC and Plaintiffs were in a confidential and/or fiduciary relationship. Therefore, the question for the Court is whether the evidence, taken in the light most favorable to the Plaintiffs, would support a finding that there was a special relationship between

GMAC and the Plaintiffs. The Court will first address the relationship between GMAC and Yerington Ford.

Under Nevada law, "[a] fiduciary relationship exists when one has the right to expect trust and confidence in the integrity and fidelity of another." *Powers v. United Services Auto. Ass'n,* 115 Nev. 38, 979 P.2d 1286, 1288 (1999) (approving jury instruction defining fiduciary duty in the context of an insurance bad faith claim). Nevada courts also recognize the existence of a "confidential relationship," which

> may arise by reason of kinship or professional, business, or social relationships between the parties. Such a relationship exists when one party gains the confidence of the other and purports to act or advise with the other's interests in mind; it may exist although there is no fiduciary relationship; it is particularly likely to exist when there is a family relationship or one of friendship.

*Perry v. Jordan,* 111 Nev. 943, 900 P.2d 335, 337–38 (1995) (internal quotations and citations omitted); *See also Randono v. Turk,* 86 Nev. 123, 466 P.2d 218, 222 (1970) ("A confidential relation exists between two persons, whether their relations be such as are technically fiduciary or merely informal, whenever one trusts in and relies on the other. The question in such case is always whether or not trust is reposed."). Both types of relationships give rise to a duty on the part of "the person in whom the special trust is placed ... to act in good faith and with due regard to the interests of the other party." *Perry,* 900 P.2d at 338. Whether such a relationship exists appears to be a question of fact. *Mackintosh v. Cal. Fed. Sav. & Loan Ass'n,* 113 Nev. 393, 935 P.2d 1154, 1160 (1997) ("[T]he existence of a special relationship is a factual question[;] ... all of the facts must be considered in order to determine if the relationship was created."). However, the question for the Court is whether, under the circumstances of this case, a reasonable jury could conclude that a *reasonable person* would impart special confidence in the other party and whether that other party would *reasonably* know of this confidence. *See id.* at 1160.

Nevada courts have recognized fiduciary relationships between insurers and insureds, *Powers,* 979 P.2d at 1288, attorneys and their clients, *Cook v. Cook,* 112 Nev. 179, 912 P.2d 264, 266 (1996), marital partners, *id.,* fiancés, *Fick v. Fick,* 109 Nev. 458, 851 P.2d 445, 449–50 (1993), corporate officers or directors and their corporations, *Leavitt v. Leisure Sports Incorporation,* 103 Nev. 81, 734 P.2d 1221, 1224 (1987), and physicians and their patients. *Hoopes v. Hammargren,* 102 Nev. 425, 725 P.2d 238, 242 (1986). Confidential relationships not rising to the level of fiduciary relationships, yet still giving rise to legally enforceable duties, have been found between a purchaser and the seller/lender of property where the seller/lender failed to disclose a known flooding problem, *Mackintosh,* 935 P.2d at 1160, and between close friends, where one party relied on the other's vastly greater education and expertise in a business transaction. *Perry,* 900 P.2d at 337–38. Nevada courts have also recognized a confidential relationship between a real estate broker/investment adviser and the married couple whom he advised. *Randono,* 466 P.2d at 222. In another case between a purchaser and a seller of real property, the Nevada Supreme Court declined to find a fiduciary relationship, but remanded the case for further fact-finding as to whether a relationship of "special confidence" would still support a claim for constructive fraud. *See Executive Mgmt. v. Ticor Title Ins. Co.,* 114 Nev. 823, 963 P.2d 465, 477 (1998). Under other circumstances, however, Nevada courts have not found any fiduciary or confidential relationship under the facts

presented. In one case, the Nevada Supreme Court found no "fiduciary relationship, ... special relationship, or ... relationship of any kind" between a breast implant manufacturer and an injured plaintiff, and therefore no duty to disclose its "superior knowledge" of the risks posed by silicone in the human body. *Dow Chemical Co. v. Mahlum*, 114 Nev. 1468, 970 P.2d 98, 111 (1998), *disapproved on other grounds, GES, Inc. v. Corbitt*, 117 Nev. 265, 21 P.3d 11 (2001). In *Bynum v. Frisby*, 73 Nev. 145, 311 P.2d 972, 975 (1957), the Court held that Nevada statutes precluded a fiduciary relationship between the partners to a partnership and a "stranger" who had been assigned a mere interest in the partnership's profits.

However, the Nevada Supreme Court has yet to recognize the existence of a fiduciary relationship arising from the relationship between a lender and a debtor, or between a lender and a guarantor. In the absence of controlling precedent from the Nevada Supreme Court, this Court must use its own best judgement to predict how the state court would decide the relevant substantive issues. *Dimidowich v. Bell & Howell*, 803 F.2d 1473, 1482 (9th Cir.1986), *reh'g denied, modified*, 810 F.2d 1517 (9th Cir.1987); *Takahashi v. Loomis Armored Car Service*, 625 F.2d 314, 316 (9th Cir.1980); *Associated Aviation Underwriters, Inc. v. Vegas Jet, L.L.C.*, 106 F.Supp.2d 1051, 1053 (D.Nev.2000). "In

doing so, this Court may look to state court decisions from sister jurisdictions, treatises and other helpful resources." *Vegas Jet*, 106 F.Supp.2d at 1053.

Many jurisdictions hold that a lender does not ordinarily owe a fiduciary duty to a borrower. *See, e.g., AM Cosmetics, Inc. v. Solomon*, 67 F.Supp.2d 312, 320 (S.D.N.Y.1999) (interpreting New York law); *Keys Jeep Eagle, Inc. v. Chrysler Corp.*, 897 F.Supp. 1437, 1443 (S.D.Fla. 1995) (interpreting Florida law); *GE Capital Mortg. Services, Inc. v. Pinnacle Mortg.*, 897 F.Supp. 854, 863 (E.D.Pa.1995) (interpreting Pennsylvania law); *Gen'l Motors Corp. v. Bell*, 714 So.2d 268, 281 (Ala.1996); *Daniels v. Army Nat. Bank*, 249 Kan. 654, 822 P.2d 39, 42 (1991); *Stewart v. Machias Sav. Bank*, 762 A.2d 44, 46 (Me.2000); *Lee v. LPP Mortg. Ltd.*, 74 P.3d 152, 161 (Wyo.2003).

As support for their argument that a fiduciary duty existed between GMAC and Yerington Ford, Plaintiffs point to numerous cases, very few of which even involve a relationship between a creditor and a debtor.[6] As a result, those cases are inapposite to the current case, and they offer no support for Plaintiffs' argument that a fiduciary relationship exists in a creditor-debtor relationship. One case cited by Plaintiffs, *Matter of Conservatorship of Roth*, 804 P.2d 265 (Colo.App.1990), did involve a creditor-debtor relationship in

---

**6.** *Security Nat'l Bank v. Peters, Writer & Christensen, Inc.*, 39 Colo.App. 344, 569 P.2d 875 (1977) (corporate directors' fiduciary duties to preferred shareholders); *Loucks v. McCormick*, 198 Kan. 351, 424 P.2d 555 (1967) (no fiduciary relationship found); *Braselton v. Nicolas & Morris*, 557 S.W.2d 187 (Tex.Civ.App. 1977) (attorney-client relationship); *In re Guardianship of Chandos*, 18 Ariz.App. 583, 504 P.2d 524 (1972) (guardian/manager of money's fiduciary duty to ward); *Paskvan v. Mesich*, 455 P.2d 229 (Alaska 1969) (will contest regarding managing business partner's fiduciary duty to nonmanaging partner); *Ste-*

*vens v. Marco*, 147 Cal.App.2d 357, 305 P.2d 669 (1957) (fiduciary relationship found where person is entrusted with an inventor's secrets in order to perfect a patent); *Ford v. Guarantee Abstract & Title Co., Inc.*, 220 Kan. 244, 553 P.2d 254 (1976) (escrow company's fiduciary duties to buyer and seller of property); *Eagerton v. Fleming*, 145 Ariz. 289, 700 P.2d 1389 (1985) (son who took control of father's finances owed him fiduciary duties); *Carter v. Hoblit*, 755 P.2d 1084 (Alaska 1988) (friend who acted as agent in real estate investment owed fiduciary duty to other owners).

which a fiduciary duty was found to exist, but it is distinguishable from the present action. In *Roth,* a fiduciary relationship was found to exist between a bank and an account holder. The bank had opened an account pursuant to a letter of conservatorship of a minor's estate which restricted the removal of funds without court order. The bank then loaned the conservatrix money while pledging the conservator account funds as security. The court found that the bank owed a fiduciary duty not to jeopardize the estate's funds because it had specifically agreed to the conservatorship restrictions when it opened the account. *Roth* is inapposite to this case as the Court has been presented with no evidence that GMAC entered into any special agreements regarding Yerington Ford's credit arrangements. Therefore, the Court is satisfied that the Nevada Supreme Court would hold that an arms-length lender-borrower relationship is not fiduciary in nature, absent exceptional circumstances.

■ Since a fiduciary relationship does not ordinarily arise out of a creditor-debtor relationship, to prove that a special relationship existed between GMAC and Yerington Ford, the Plaintiffs must set forth facts sufficient that, despite the general rule, a reasonable jury could find the existence of that relationship. *See Liberty Lobby,* 477 U.S. at 248, 106 S.Ct. 2505, 91 L.Ed.2d 202. The Nevada Supreme Court has fashioned the *Mackintosh* test as a means of determining whether a special relationship exists. Under that test, for a jury to conclude that a special relationship existed between GMAC and Yerington Ford, it would need to find (1) that the conditions would reasonably have caused Yerington Ford to place special trust and confidence in GMAC, and (2) that GMAC would reasonably have known of this confidence. *Mackintosh,* 935 P.2d at 1160. As evidence for the proposition that GMAC owed Yerington Ford fiduciary-type

duties, Plaintiffs point to the fact that when Giles first entered into a business relationship with GMAC in 1992, the branch manager told Giles that the relationship between GMAC and the dealership was "like a marriage." (Tr. of William Giles 143:19–25.) Giles has further testified that he and his wife are unsophisticated regarding floorplan financing. (*Id.* at 120:23–121:7.) Lastly, Giles claims that Douglas Snyder became his personal friend. (*Id.* at 192:6–195:19.)

However, this evidence must be viewed in the context of the other undisputed evidence already noted by the Court. When Mr. Giles' Chevrolet dealership first entered into a business relationship with GMAC, Mrs. Giles signed a Lease Plan Dealer Agreement specifically stating that "neither party owes the other any fiduciary obligation." (Def.'s Mot. Summ. J., Counts 3–13(# 78) at 4.) When Giles formed Yerington Ford, he signed a GMAC Retail Plan that states that "neither party owes the other any fiduciary obligation." (*Id.*) That Giles did not read these provisions is immaterial to their validity. Parties may be held to contracts they never read. *Pentax Corp. v. Boyd,* 111 Nev. 1296, 904 P.2d 1024, 1026 (1995) (interpreting Colorado law); *see also Gage v. Phillips,* 26 P. 60, 61–62, 21 Nev. 150 (Nev.1891) ("The mere statement of the defendant 'that she did not know what she was signing, when she signed the bill of sale' is no excuse in law.").

In fact, that a businessman with 30 years of experience selling cars would fail to read the basic terms of such significant contracts is evidence that the Giles alleged special reliance was *unreasonable.* *See Mackintosh,* 935 P.2d at 1160. The extent of Giles' unreasonable belief is illustrated by his testimony that he believes that *any* floorplan financing lender is in a fiduciary relationship with a dealer. (Dep. of William Giles, at 190:11–19.) As the Wyoming

Supreme Court has noted, "[b]ecause fiduciary relationships carry significant legal consequences, they cannot be the product of wishful thinking." *Lee v. LPP Mortgage Ltd.*, 74 P.3d 152, 162 (Wyo.2003). Furthermore, "[f]iduciary duty is not created by a unilateral decision to repose trust and confidence; it derives from the conduct or undertaking of the purported fiduciary." *Id.* at 162 (quoting *Farmers Ins. Co. v. McCarthy*, 871 S.W.2d 82, 87 (Mo.App.1994)).

The evidence presented by Plaintiffs of a fiduciary relationship is flimsy at best, and it necessitates that the Court conclude that Giles made a rational and informed decision to switch from Ford to GMAC because he thought GMAC's floorplan was more conducive to his commercial interests. The fact that he was a close friend with a mid-level management employee of GMAC at the time he switched financing from Ford Motor Credit to GMAC, in and of itself, is insufficient to overcome the general rule that a lender-debtor relationship does not give rise to a fiduciary duty. Giles testified that he switched financing because (1) Snyder was a good friend and "it would be a feather in his [Snyder's] cap," and (2) Giles liked the way GMAC counted cars. (Dep. of William Giles, at 156:22–157:21.) On behalf of Yerington Ford, Giles signed a document that made clear that no fiduciary relationship was to arise from the relationship between Yerington Ford and GMAC. Given Giles' level of experience and knowledge, a reasonable jury could not find that Yerington Ford was reasonable in its alleged special reliance on GMAC. Therefore, Plaintiffs have failed to meet the first prong of the *Mackintosh* test, which requires that the person placing special reliance in the other party do so reasonably. *See Mackintosh*, 935 P.2d at 1160 (Nev.1997).

Plaintiff are even less likely to qualify under the second prong of the *Mackintosh* test, which requires that the party in whom the special reliance and trust is placed would reasonably have known of the confidence placed in them. *Id.* at 1160. That GMAC, a large corporation, would assume that Giles, a veteran businessman, would rely upon the language in the contract that defined their relationship is the epitome of reasonableness. That language specifically set out that the intention of the parties was to avoid the creation of a fiduciary relationship. (*See* Def.'s Mot. Summ. J., Counts 3–13(# 78) at 4.) Giles is an experienced businessman, capable of taking adequate precautions to protect his business and its business transactions. To expect GMAC to know that the Yerington Ford expected it to act as a fiduciary simply because Giles trusted GMAC and became friends with their branch manager would be unjust and unreasonable. Indeed, in most commercial relationships, a friendship develops between the contracting parties. To suggest that the creation of these friendships allows a party to escape from the substantive terms of a commercial contract would spell the demise of the very purpose of contracts. This Court cannot allow Plaintiffs to neutralize the contract defining the relationship between the parties without sufficient evidence to convince a jury of their claim. Plaintiffs have not met that burden, and the Court finds that a reasonable jury could not find the existence of a fiduciary or confidential relationship between GMAC and Yerington Ford.

## C. RELATIONSHIP BETWEEN GMAC AND THE GILES

■ The Giles' individual claims for breach of fiduciary duty fare no better. The Nevada Supreme Court has yet to recognize the existence of a fiduciary relationship arising from the relationship between a guarantor and a creditor. In the absence of controlling precedent from the Nevada Supreme Court, this Court must

use its own best judgement to predict how the state court would decide the relevant substantive issues. *Dimidowich v. Bell & Howell,* 803 F.2d 1473, 1482 (9th Cir.1986), *reh'g denied, modified,* 810 F.2d 1517 (9th Cir.1987); *Takahashi v. Loomis Armored Car Service,* 625 F.2d 314, 316 (9th Cir. 1980); *Associated Aviation Underwriters, Inc. v. Vegas Jet, L.L.C.,* 106 F.Supp.2d 1051, 1053 (D.Nev.2000). "In doing so, this Court may look to state court decisions from sister jurisdictions, treatises and other helpful resources." *Vegas Jet,* 106 F.Supp.2d at 1053.

As a general rule, no fiduciary relationship exists between a guarantor and a creditor as a matter of law. *See, e.g., Sumitomo Bank of Cal. v. Iwasaki,* 70 Cal.2d 81, 73 Cal.Rptr. 564, 447 P.2d 956, 959 n. 3 (1968); *Schrager v. North Community Bank,* 328 Ill.App.3d 696, 262 Ill. Dec. 916, 767 N.E.2d 376, 385 (2002); *DeAngelis v. Rose,* 320 N.J.Super. 263, 727 A.2d 61, 69 (1999); *Miller v. U.S. Bank of Washington, N.A.,* 72 Wash.App. 416, 865 P.2d 536, 543–44 (1994); *First Nat'l Bank & Trust Co. v. Notte,* 97 Wis.2d 207, 293 N.W.2d 530, 534 (1980); *Lee v. LPP Mortg. Ltd.,* 74 P.3d at 162. The Court expects that Nevada would adopt the same stance if faced with the issue.

Normally, the relationship between a creditor and a guarantor is inherently antagonistic. *Knox,* 74 P.2d at 163. The creditor requires a guarantee because it feels that the debtor's assets, standing alone, may not support the loan. *Id.* In this type of relationship, the creditor has not voluntarily assumed any responsibility to protect the guarantor. *Id.* Indeed, the purpose of a guaranty is to protect the interests of the creditor, not those of the guarantor.

In the current action, the Giles have made a claim for intentional infliction of emotional distress against GMAC. They have based this allegation on the alleged existence of a fiduciary relationship between themselves as guarantors and GMAC. The Court has already found that no fiduciary relationship existed between GMAC and its principal debtor, Yerington Ford. The Giles, as guarantors, are one-step removed from the relationship between GMAC and Yerington Ford, as they simply guarantee the loan from GMAC to Yerington Ford. Even if a fiduciary-type relationship were to exist between GMAC and Yerington Ford, it would be a giant leap to suggest that the guarantor also enjoys a fiduciary relationship with the creditor, GMAC. As the Washington Court of Appeals observed in *Miller v. U.S. Bank,* "the standard for creating a fiduciary duty between a guarantor and a lender will be even more difficult to meet [than the standard between a borrower and lender] since there is generally no regular, ongoing relationship between them; the loan contract only involves the lender and its borrower, the guarantor's principal." 865 P.2d at 44. Indeed, it makes little sense for a guarantor to be able to claim the existence of a fiduciary relationship where the borrower itself has been unable to establish the existence of such a relationship.

The Court applies the same analysis to the Giles personal claims of breach of fiduciary duty as it does to Yerington Ford's claims for breach of fiduciary duty. Without some added evidence to show why the Giles were owed a fiduciary duty, their claim for breach of fiduciary duty will be dismissed as insufficient to convince a reasonable jury of its existence. Plaintiffs have adduced no additional evidence as to why the Giles were entitled to a greater duty than was the principal debtor, Yerington Ford. The Court finds that a reasonable jury could not find that a fiduciary relationship existed between GMAC and the Giles as guarantors. Furthermore, as the Giles claims for intentional infliction of emotional distress are based upon the exis-

tence of a special relationship between themselves and GMAC, those claims must also be dismissed.

### D. CONSTRUCTIVE FRAUD

■ Count 3 of the Amended Complaint alleges a claim for constructive fraud. Constructive fraud is characterized by a breach of duty arising out of a fiduciary or confidential relationship. *Perry v. Jordan,* 111 Nev. 943, 900 P.2d 335, 337 (1995).

■ Nevada has recognized the existence of confidential relationships not rising to the level of fiduciary relationships, yet still giving rise to legally enforceable duties. The leading case on constructive fraud is *Perry v. Jordan,* 111 Nev. 943, 900 P.2d 335, 337 (1995). In *Perry,* the court stated that a confidential relationship "exists when one party gains the confidence of the other and *purports to act or advise with the other's interests in mind." Id.* at 338 (emphasis added). A confidential relationship may arise "where one party imposes confidence in the other because of that person's position, *and the other party knows of this confidence." Id.* at 337 (emphasis added). Plaintiffs have failed to provide the Court with evidence sufficient to show that GMAC "[purported] to act or advise with [Plaintiffs] interests in mind," *Id.* at 338, and, likewise, the Court is also unaware of evidence that GMAC knew of Plaintiffs' alleged confidence in them. There is no evidence to suggest that Doug Snyder, or anyone else at GMAC knew that the Giles were imposing trust and confidence in GMAC to the extent that they would specially rely on GMAC for financial advice.

Furthermore, as one court observed:

The mere fact that one reposes trust and confidence in another does not create a confidential relationship. In the majority of business dealings, opposite parties have trust and confidence in each other's integrity, but there is no confidential relationship by this alone.

*Doxie v. Ford Motor Credit Co.,* 603 F.Supp. 624, 629 (D.Ga.1984) (refusing to find a confidential relationship between an automobile purchaser and a credit finance company) (internal citations omitted).

The evidence is uncontroverted that Giles was an experienced businessman with 30 years of experience in the automobile dealership business and that he had served as a General Sales Manager of a Chevrolet dealership prior to purchasing Yerington Ford. Under these circumstances, Plaintiffs are required to present evidence sufficient to show that, notwithstanding his experience and knowledge, GMAC knew, or should have known, that the Giles expected GMAC to act with Yerington Ford's best interests in mind. *See Mackintosh,* 935 P.2d at 1160. As the Court has concluded, Plaintiffs have failed to provide evidence sufficient to overcome the general rule that no special relationship exists between a creditor and a debtor, or between a creditor and a guarantor. Therefore, Plaintiffs' claim for constructive fraud will be dismissed.

### E. UNDUE INFLUENCE

■ Count 3 of the Amended Complaint makes a claim for undue influence. Defendants first argument is that Nevada does not recognize a separate cause of action for undue influence. The Court finds it unnecessary to decide whether such a claim would be allowed under Nevada law, because, even if such a claim were permitted under Nevada law, Plaintiffs would have failed to support the claim with sufficient evidence.

Undue influence may be grounds for rescission of a contract. *See Oh v. Wilson,* 112 Nev. 38, 910 P.2d 276 (1996). It is also often cited in probate actions. *See Ross v. Giacomo,* 97 Nev. 550, 635 P.2d 298 (1981); *Schmidt v. Merriweather,* 82 Nev. 372, 418

P.2d 991 (1966). Undue influence is dependent on the existence of a fiduciary or confidential relationship. As the Nevada Supreme Court has stated:

> Where an antecedent fiduciary relation exists, a court of equity will *presume* confidence placed and influence exerted; where there is no such fiduciary relation, the confidence and influence must be *proved* by satisfactory extrinsic evidence; the rules of equity and the remedies which it bestows are exactly the same in each of these two cases. The doctrine of equity concerning undue influence is very broad, and is based upon principles of the highest morality. It reaches every case, and grants relief where influence is acquired and abused, or where confidence is reposed and betrayed. It is specially active and searching in dealing with gifts, but is applied, when necessary, to conveyances, contracts executory and executed, and wills.

*Peardon v. Peardon,* 65 Nev. 717, 201 P.2d 309, 333 (1948) (internal citations omitted). As the Court has found that no reasonable jury could find that a confidential or fiduciary relationship existed between GMAC and the Plaintiffs in this case, a claim for undue influence will not stand.

## V. CONCLUSION

The Court concludes that, when the alleged losses are purely economic in nature, the Nevada Supreme Court would find that the economic loss doctrine bars intentional and/or negligent tort and fraud claims when they are interwoven with the underlying contract between the parties. Plaintiff Yerington Ford's tort and fraud claims are all interwoven with its contract claims, so they will be dismissed.

The Court further concludes that the Nevada Supreme Court would find that, generally, no fiduciary duty arises from an arms-length transaction between a creditor and a debtor. Plaintiffs have failed to adduce sufficient evidence to overcome the general rule, and their claims for breach of fiduciary duty will be dismissed. Similarly, their claims for constructive fraud, undue influence, and intentional infliction of emotional distress will also be dismissed.

IT IS THEREFORE ORDERED that Defendant's Motion for Summary Judgment on Counts 1–12 (Docket No. 100) is GRANTED.

Defendant's Motion for Summary Judgment on Counts 3–13 (Docket No. 78) is also GRANTED.

As a result, Defendant's Motion for Summary Judgment (Docket No. 79) and Defendant's Consolidated Motions in Limine (Docket No. 81) are DISMISSED AS MOOT and Plaintiffs' case must be DISMISSED.

IT IS SO ORDERED.